## MARTEL MILLS CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

### No. 4628.

Circuit Court of Appeals, Fourth Circuit.

Sept. 6, 1940.

George Bell Timmerman, of Lexington, S. C., and J. Vaughan Gary, of Richmond, Va. (Wm. M. Blackwell, of Richmond, Va., on the brief), for petitioner.

Ernest A. Gross, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Bertram Edises and Ernest Cook, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

The Martel Mills Corporation has petitioned this Court to review and set aside an order issued by the National Labor Relations Board against the petitioner pursuant to Section .10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. In its answer, the Board has requested that its order be enforced.

The Martel Mills Corporation (hereinafter called the Martel Mills) is a Delaware corporation having its principal office in New York City. It is engaged in the business of processing cotton in various mills in the states of North Carolina, South Carolina, and Georgia. The present proceedings are concerned only with the Lexington mill, located at Lexington, South Carolina, and the Red Bank mill, located at Red Bank, South Carolina. During 1938, the Martel Mills used at the Lexington mill about $145,000 worth of raw materials and supplies, more than 50 per cent of which was purchased outside of South Carolina and shipped to Lexington by rail and truck. The Lexington mill, employing about 250 persons, produced approximately 2,800,000 yards of cloth worth approximately $280,000. Over 75 per cent of this cloth was shipped to points outside South Carolina. The Red Bank mill is approximately the same size as the Lexington mill and is engaged in a similar type of operation.

The labor organization involved in these proceedings is the Textile Workers Organizing Committee (hereinafter called the T. W. O. C.), affiliated with the Congress of Industrial Organizations. During August and September of 1938 and January of 1939, it filed charges before the National Labor Relations Board (hereinafter called the Board), against the Martel Mills. On January 25, 1939, the Board issued its complaint alleging, in substance, that the Martel Mills had discharged and thereafter refused to reinstate George P. Schwartz, Buster W. Whittle, Mrs. Pinkie Whittle, and D. B. Waits because of their membership in the T. W. O. C. and because they had engaged in concerted activities with other employees in behalf of the T. W. O. C. for the purpose of collective bargaining and other mutual aid and protection; that the Martel Mills warned its employees not to join or assist the T. W. O. C. on the pain of discharge or other discrimination; that by these and other acts the Martel Mills had engaged in, and was engaging in, unfair labor practices affecting commerce within the meaning of Section 8(1) and (3) and Section 2(6) and (7) of the National Labor Relations Act, supra (hereinafter called the Act). In its answer, the Martel Mills denied the allegations of unfair labor practices and averred that it had laid off Schwartz, the Whittles and Waits, and had refused the Whittles reemployment for cause; that it had re-employed Waits; that it had offered re-employment to Schwartz who did not accept the offer.

On February 2nd and 3rd, 1939, a hearing was held at Columbia, South Carolina, before a Trial Examiner duly designated by the Board. He filed his Intermediate Report on March 13, 1939, in which he found that the respondent had engaged in, and was engaging in, the aforementioned unfair labor practices. He recommended that the respondent cease and desist from such practices and that it take certain affirmative action. The Martel Mills filed exceptions.

Thereafter, oral argument on the exceptions was had before the Board. On February 23, 1940, the Board rendered its decision affirming in substance the findings of the Trial Examiner. The Board concluded:

"2. By discriminating in regard to the hire and tenure of employment of George B. Schwartz, D. B. Waits, Buster W. Whittle, and Mrs. Pinkie Whittle, thereby discouraging membership in Textile Work-

ers' Organizing Committee, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8(3) of the Act.

"3. By interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8(1) of the Act.

"4. The aforesaid unfair labor practices are unfair labor practices affecting commerce, within the meaning of Section 2(6) and (7) of the Act."

Upon the basis of its findings of fact and conclusions of law, the Board ordered the Martel Mills to cease and desist from engaging in the unfair labor practices, to reinstate, with back pay, the persons found to have suffered discrimination, and to post appropriate notices.

In reviewing this order of the Board, we are not unmindful of the recent mandate of the Supreme Court in the case of National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 495–496, 84 L.Ed. 704, wherein it was said: "In that Act, Congress provided, 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' [49 Stat. 449, Sec. 10(e), 29 U.S. C.A. § 160(e)]. It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act." In Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, at page 989, Judge Parker speaking for this court said: "We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported." See, also, National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 958; Burlington Dyeing & Finishing Co. v. National Labor Relations Board, 4 Cir., 104 F.2d 736, 739; National Labor Relations Board v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288, 292, 293.

The recognition of a rule, however, does not always simplify its application. It is one thing to state that the findings of the Board will be deemed conclusive where they are sustained by substantial evidence; it is quite another thing to define precisely what is meant by the term "substantial", and to apply that definition to the concrete case. The Supreme Court has stated: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. Again it has been said that substantial evidence is evidence that affords a substantial basis of fact from which the fact in issue can be reasonably inferred. See National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660. There must be sufficient evidence to justify, if a trial were to a jury, "a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See Baltimore & Ohio R. Co. v. Groeger, 266 U.S. 521, 524, 45 S.Ct. 169, 170, 69 L.Ed. 419; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Appalachian Electric Power Co. v. National Labor Relations Board, supra, page 989 of 93 F.2d." 306 U.S. at page 300, 59 S.Ct. at page 505, 83 L.Ed. 660.

Variations in the definitions of this elusive term could easily be repeated. It seems quite clear, though, that the Act does not permit a court to substitute its judgment for that of the Board. Although we might differ from the conclusions reached by the Board, we are bound by these conclusions where there is a reasonable amount of evidence to support them. National Labor Relations Board v. Waterman S. S. Corp., supra, 309 U.S. 206, 60 S.Ct. at page 504, 84 L.Ed. 704. On the other hand, where the findings are unsupported by a substantial amount of evidence, or where they are based upon a mere suspicion, it is the duty of this Court to

set aside such findings or order based thereon. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; National Labor Relations Board v. Columbian Enameling & Stamping Co., supra.

The Board found, and it was not disputed, that the reduction in the personnel in the Lexington and Red Bank mills in February, 1938, was due to economic considerations. Before that time, the Martel Mills operated two shifts a day at Lexington and three shifts a day at Red Bank. However, on February 23, one shift was cut off at Red Bank and Waits and the Whittles were dismissed at that time along with about one-third of the employees at the Red Bank mill. On March 2, the second shift at Lexington was discontinued and Schwartz, along with approximately half of the Lexington employees, was dismissed. A second shift was added at the Lexington mill on May 3, 1938, and on November 19, 1938, a third shift was added. A third shift was added at Red Bank in July, 1938. The Board found that neither Schwartz nor Waits was discriminated against at the time of his lay-off; but that each was discriminated against when he was not re-employed at the time the shifts were added. The Board found that the Whittles had been discriminatorily discharged.

In considering the weight of the evidence supporting the Board's finding of discrimination in all of the cases subsequently to be discussed, we think it quite important that all the evidence be considered against the general background of labor conditions prevailing at the Martel Mills. There had been a complete absence of labor difficulties at either Lexington or Red Bank. Although a local unit of the T. W. O. C. (hereinafter called the Local) had been formed and had appointed an active Grievance Committee, it had not taken any steps towards securing official recognition or a collective agreement. The formation of the Local dates back to 1934 when, through the consent of the Martel Mills, the employees were given the opportunity to learn about union activities. This event occurred during a general textile strike, when some of the "Flying Squadrons" (groups of union organizers touring the country) came to Lexington and Red Bank. Schwartz testified that Rush, Superintendent of the Red Bank and Lexington Mills, had closed down each of the plants for a period of fifteen minutes to allow these organizers to address the employees. (Joint App., p. 23.) It was after this meeting that the employees of Martel Mills first gave signs of organizing. A number of the employees immediately thereafter joined the United Textile Workers of America (hereinafter called the U. T. W. A.). Schwartz stated that he had joined the U. T. W. A. after this meeting. In 1937 and 1938, after an inception partly due to the aforementioned co-operation of the Martel Mills, the Local took more permanent shape under the banner of the T. W. O. C. A Grievance Committee was formed by the Local President which consulted with Superintendent Rush on five or six occasions during the nine months preceding the alleged discrimination. Rush had informed this Committee that he would always be glad to talk with them, though the T. W. O. C. had never been declared the official agency of the employees for collective bargaining. Acting under specific instructions from the management, Rush and the other superintendents of the Martel Mills advised the overseers not to discriminate against any person because of membership in the union. The Local thrived despite its unofficial status and, as a Board witness stated (Joint App., p. 85), has secured most of the employees as members.

With this background constantly in view, for we think it sheds no little light on the entire picture, we proceed to discuss, as to each employee, the evidence relating to the alleged illegal discriminations.

The Board's finding that the Martel Mills refused to reinstate Schwartz on May 3, 1938, and thereafter, because of his union activities, has its principal roots in the facts that Schwartz, a "smash hand" at the mill, was the recording secretary of the Local, served as a member of the Grievance Committee, and had solicited membership in the Local at the homes of approximately 18 or 20 employees. Much weight was given to a conversation between Schwartz and Rush. (See Joint App., p. 32.) After a careful consideration of all the testimony, we have reached the conclusion that there is a lack of substantial evidence to support the Board's finding of unlawful discrimination in the refusal to reinstate Schwartz. Schwartz had been laid-off at a time of economic stress, when the Martel Mills was forced to dismiss approximately one-half of the employees at the Lexington mill. Although the Board questioned the alleged inefficiency of

Schwartz in the face of direct testimony by his overseer to that effect, and although the Board emphasized that he had received an individual increase in salary in disregard of Schwartz's own testimony that his wife and others had also received raises— the occasion being a stretch-out increase in the work (Joint App., pp. 42, 43, 45)— the Board was forced to the conclusion that the record failed to establish that his lay-off was discriminatory. Inasmuch as Schwartz's wife was retained in the employ of the Martel Mills, the Board stated that "the respondent apparently proceeded in conformity of its avowed policy of retaining only one person from each family, and there is no evidence that this policy was disregarded at the Lexington Mill." (Joint App., p. 219.) How the Board failed to find discrimination in regard to Schwartz's lay-off, but still found it present in the refusal to reinstate him, troubles this Court. There is uncontradicted testimony to the effect that Schwartz's position of smash hand was eliminated because of a reorganization in the mill; that Schwartz had been found inefficient at times; that he had antagonized Rush by his persistence in repeating his request for work and by his misstatement of a fact as to his overseer in reference to the reinstatement, (Joint App. pp. 31, 195); that his wife has held her position as a spinner throughout all the economic difficulties and is still so employed; that his son is now employed by the mill; that Rush is willing to re-employ Schwartz in the place taken by his son; that Schwartz is now operating a store which he states is owned by his son.

▮ Furthermore, there is direct evidence to the effect that the Martel Mills had offered to reinstate Schwartz, though Schwartz denies receiving any offer. To quote from the Board's opinion (Joint App., p. 221): "Miller (Schwartz's overseer) testified that during the week prior to the employment of a third shift in November, 1938, a position as helper in the slasher room on the first shift was open; that he had told Mrs. Schwartz, at her place of work, that a job would be available and that either Schwartz or their son, who had previously applied for employment, could have the position; and that on the following Monday, Schwartz's son came in and was given a job. Mrs. Schwartz was not called as a witness, but Miller admitted on cross examination that on the first day of

the hearing Mrs. Schwartz denied that he, Miller, had told her that a job was open. Schwartz denied that he had been advised of any offer of employment; stated that his son had applied for a job when the third shift was added and was given a job on the third shift; and testified that he would have preferred to have worked himself, since his son, a minor, was going to school and operating a store and filling station at which Schwartz clerked." The Board found, on the hearsay denial of Mrs. Schwartz, that this offer had never been made. It is our conclusion that the basis for this finding is that type of hearsay which, though admissible under Section 10(b) of the Act, is not sufficient evidence to be treated as "substantial" and is, therefore, not binding upon this court. Consolidated Edison Co. v. National Labor Relations Board, supra, 305 U.S. at page 230, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 98 F.2d 406, 409, rehearing denied, 5 Cir., 98 F.2d 870. The Board preferred the alleged denials of Mrs. Schwartz to the contrary testimony of Miller in the teeth of the fact that Mrs. Schwartz and her son were both working at the Lexington mill at the time of the hearing and were obviously available as witnesses. Hearsay evidence may be sufficient to support the Board's finding, "at least if more is not conveniently available, and if in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs." National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 873, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540. See, also, National Labor Relations Board v. American Potash & Chem. Corp., 9 Cir., 98 F.2d 488, 493–494, certiorari denied 306 U.S. 643, 59 S.Ct. 582, 83 L.Ed. 1043. However, hearsay evidence is not sufficient where, as is the case here, it is both specifically denied and is substituted for direct evidence which is conveniently available.

In reference to Schwartz's testimony as to his conversation with Rush, mentioned above, it is our conclusion that Rush's statements were as explainable as they were innocuous. Schwartz testified (Joint App., p. 32): "I asked him about getting— about giving me some work back. I told him I would be willing to take anything I could get, that I needed to work. He said, 'Well, I will see'. I believe that is

the way he said it. I said, 'Well, Mr. Rush, if I have said anything or done anything against you or the company I would be glad if you would tell me, because I would like to straighten it out.' He said to me, he said, 'did you say anything like this, that the CIO was paying you $14 a week,' I said, 'no, sir, I didn't say it'. I said, 'they haven't paid me a dime'. He said, 'well, what about people running you away from their homes soliciting membership,' I said, 'no, sir, they never have, that every one that I have ever been to yet treated me just as nice as they could when I went to their homes'. * * * He said, 'Well, I will see. If there is anything I can give you I will let you know,' and I haven't heard anything yet." The tone of the conversation was friendly. Still further, both Schwartz and Rush agreed that at the conclusion of the conversation Schwartz left with the promise that if a position was available Schwartz would be employed. Where one of the considerations for preferring one employee to another is the economic needs of the employee, an inquiry into a rumoured income does not shock this Court. As to the statement with reference to Schwartz's solicitations, Rush's concern over possible disturbances among his workers is not reprehensible. (Joint App., p. 202.)

After concluding that "the evidence was insufficient to establish that Waits' T. W. O. C. membership and activity were the reasons for his lay-off", the Board did find that this T. W. O. C. membership and activity were the causes for the refusal to reinstate Waits. Evidence for this finding was sought in the facts that Waits, a loom fixer, was the second employee at the Red Bank mill to join the T. W. O. C., and that he gave out application blanks for the Local. Also, great probative force was given to an alleged statement by Rush to the effect that he did not "fool" with Waits because of his union membership. (Joint App., p. 93.) Since Waits was the owner of a farm and since the Board recognized that economic need was considered by the Martel Mills in selecting employees for dismissal, the Board felt bound to the finding that Waits' ownership of a farm was the controlling consideration in his dismissal. Nevertheless, the Board reached the further finding of discrimination as to the reinstatement with only two additional facts to consider: (1) Waits had secured a position with the County Chain Gang; (2)

Rush made statement in reference to Waits' T. W. O. C. activities. We are unable to find sufficient evidence to sustain the Board's finding.

Waits had attended only one union meeting in his whole career, the meeting at which he joined. According to his own testimony, his sole activity with the union consisted in handing out application-for-membership cards to anybody that wanted one. In view of the substantial number of employees enrolled in the Local, it seems strange that the Martel Mills should discriminate against so insignificant a member as Waits. It would require a long stretch of imagination to accept the statement that the alleged discrimination was aimed at discouraging membership in a labor organization. See 49 Stat. 452, 29 U.S.C.A. § 158(3). Waits' ownership of a farm and his position with the County Chain Gang gave him an economic position highly superior to the average unemployed mill-hand. In delaying Waits' reinstatement for four months, the Martel Mills was merely following its recognized policy of considering the economic standing of unemployed hands before making reinstatements. There was also evidence that the Martel Mills gave preference to those living in the Mill village. Waits did not live in the village. In view of the additional fact that Waits was finally reinstated in November, 1938, when an opening occurred, the evidence in support of the Board's finding, creates at best a suspicion. Cf. Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 760. Rush's testimony explaining the company policy provides the only reasonable answer to the delayed rehiring.

The strongest evidence submitted in behalf of the Board was Waits' testimony referring to the alleged statement of Rush, made in response to Waits' second request for his position (Joint App., p. 193): "He said, 'I understand that you are a member of the union, or organizing a union, or helping to organize a union around here.' He said, 'I don't care to fool with you.'" Rush expressly denied making this statement. In fact, he denied having knowledge of Waits' union membership. (Joint App., pp. 193, 203.) However, the Board accepted Waits' version of the conversation on the basis of the Trial Examiner's report on the demeanor of the two witnesses on the stand, their reaction to cross ex-

amination and certain inconsistencies of Rush's testimony.

Without question of the validity of the Trial Examiner's statement as to the relative credibility of the two witnesses, but mindful of the irreproachable past record of the Martel Mills, we hold that Rush's statement is not sufficient to uphold the Board's finding of discrimination practiced against Waits. National Labor Relations Board v. Sands Mfg. Co., supra. In the Sands Mfg. Co. case, the Board had found that the Sands Co., in violation of Section 8(1) of the Act, had interfered with, restrained, and coerced its employees in the exercise of the right of self-organization, affiliation with labor organizations and collective bargaining as guaranteed by Section 7 of the Act. The Board supported this conclusion by reference to the testimony of two witnesses. Norman, a former employee, said that a shipping clerk, who was his superior at the time, told him when he complained about his discharge: "I will tell you; there is a lot more of this than you and I know of * * *." "I will get you back when we break the union up * * *." Rudd, the other witness, stated that the superintendent said to him in June, in effect, that it would be better to have the A. F. of L. union, as it was more conservative and not so likely to strike. In reversing the Board's finding as not supported by substantial evidence, the Supreme Court stated (306 U.S. at page 342, 59 S.Ct. at page 513, 83 L.Ed. 682): "* * * the inference of hostility to MESA [the union] drawn from their testimony does not, in any event, amount to a scintilla when considered in the light of respondent's long course of conduct in respect of union activities and in dealing freely and candidly with MESA [the union]."

In the instant case, Waits testified that Rush's statement was made in anger. (Joint App., p. 93.) After Rush had refused him on two occasions, Waits then reminded him of a former promise in reference to reinstatement. Rush had the difficult task of meting out a few positions to many men. He evidently found it necessary to make some form of explanation to those who were not fortunate enough to secure reinstatement. The persistent questioning of a man in this unpleasant position was calculated to arouse his anger. He might very easily then say things which did not express his true thoughts, things which did not occupy his mind during calmer and more rational moments.

We do not lose sight of the fact that our inquiry is centered upon the motivating cause of the employer's action. The task is a difficult one. It involves an inquiry into the state of mind of the employer. Such inquiry is laden with uncertainties and false paths. Obviously our chief guide is the words of the witness under oath who undertook to disclose the workings of his mind. If his explanation is a reasonable one, the onus is upon the Board to establish the falsity of this explanation and the truth of its own interpretation. See National Labor Relations Board v. Remington Rand, Inc., supra, 94 F.2d at page 862. We are not convinced that the Board has offered sufficient evidence to meet its burden of proof. Isolated statements which alone carry incriminating import often lose their ominous significance when surrounded by all the facts of a given case. We do not find substantial evidence to support any illegal motive such as is proscribed by Section 8(3) of the Act.

Buster Whittle, a roving hauler in the card room, and his wife, Mrs. Pinkie Whittle, a spinner, were discharged on February 23, 1938, when the third shift was discontinued at the Red Bank mill. Instead of dismissing all the employees on the third shift, the Martel Mills made certain reassignments and dismissed employees from each of the three shifts. Thus, the Whittles, who were employed on the second shift, were reached in the general lay-off. The Board found that the Martel Mills discharged and refused to re-employ the Whittles because of their union activities. To support the finding of discrimination allegedly practiced against Buster Whittle, the Board relied upon the facts that Buster was an active union member; that he had procured 35 to 40 union membership applications from employees at Red Bank; that employees often called at his home to obtain membership application cards; that a T. W. O. C. representative made numerous visits to Whittle's home to collect signed cards and to confer with him; that his overseer had asked him whether he belonged to the C. I. O.; that an article had appeared in a newspaper on February 13, 1938, reporting that Whittle had made a speech at a union meeting, and that the article was discussed by Whittle's overseer

and then posted by Frye, (a card grinder who had minor supervisory duties), on a pillar where bulletins were regularly kept.

The Martel Mills admitted that it had discharged, rather than laid off, the Whittles, but denied that this was done because of their union affiliations. It offered undisputed evidence that Buster Whittle argued with the men, often left his work causing economic losses to the pieceworkers, came to work ahead of time in violation of state regulations, had been given many warnings about his general behavior; that his fellow employees complained about his actions a week before he was discharged and many other times dating back for at least a year (Joint App., pp. 145, 153); that complaints had been made about certain immoral activity that was going on in the Whittle home. The newspaper incident was explained as a joke. Whittle was unable to read and write and his reported speech at a union meeting undoubtedly provoked laughter. He admitted that his fellow-employees had joked about the incident. An examination of this brief summary of the record makes it obvious that two separate explanations are advanced for Whittle's dismissal: the Martel Mills alleges that at the time of the general lay-off, it discharged an inefficient worker; the Board concludes that the Martel Mills seized the opportunity to discharge the employee because of his union activities. Aware of the burden of proof that is imposed upon the Board in proving the employer's dominant motivation in discharging the employee, cf. National Labor Relations Board v. Remington Rand, Inc., supra, 94 F.2d at page 872, we are of the opinion that the evidence advanced to support this finding of discrimination is not substantial.

■ Whittle admitted that he did not attend union meetings very often—as he uniquely stated, "Sometimes maybe once a month." His status in the Local could not have been very imposing. Notwithstanding, the Board found that these union connections were the cause for Whittle's discharge. It seems strange that the Martel Mills should have selected Whittle (along with his wife, Schwartz and Waits) out of all the other union members as the object of discrimination. The Martel Mills has denied the Board's findings and has advanced clear evidence of valid reasons for Whittle's dismissal. Surely the Act

has not deprived the employer of his right to discharge an inefficient or disobedient employee. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953; National Labor Relations Board v. Waterman S. S. Corp., supra, 309 U.S. 206, 60 S.Ct. at page 500, 84 L.Ed. 704. Had the Martel Mills desired to discharge Whittle for his union affiliations, it could very easily have selected one of the occasions when Whittle had violated the company rules or one of the occasions when his fellow-workers complained of his actions. Instead, it allowed these complaints and disturbances to accumulate until a time when the record of the individual employee served as one of the bases for maintaining or discharging him. Whittle's record did not merit for him any favorable consideration. On the contrary, it gave indication that the employer would use the first convenient opportunity to rid itself of the undesirable employee. That Whittle was discharged instead of laid off does not evoke surprise or suspicion.

The Board concluded that Mrs. Pinkie Whittle was discharged "because the Whittle home had become the focal point of organizational activity to which the respondent was opposed." (Joint App., p. 237.) In answer to Rush's testimony that he did not know that Pinkie Whittle was a member of the Local, the Board stated in a footnote, "Whether Pinkie Whittle was discharged because of her union membership and activities or because of her husband's union membership and activities is immaterial, for in either event such a discharge would clearly discourage union affiliation." (Ibid.) For the reasons stated in reference to Buster Whittle, we are of the opinion that there is not substantial evidence to sustain a finding that Pinkie Whittle was discharged because of her husband's union membership. We are of the further opinion that there is no substantial evidence to support a finding of discrimination because of her own union activities. Her sole relationship with the Local was in her union membership and in her efforts to secure others to sign membership cards. With this latter undertaking she had no success, for she was put off by the people she approached. (Joint App., p. 80.) In explaining why Pinkie Whittle

was discharged, her overseer stated that a choice had to be made between laying off Pinkie Whittle or a girl whose father had been employed by the Martel Mills for 45 or 50 years. The overseer stated (Joint App., p. 181): "I had to make a decision. I didn't have a job for both to take. I made the decision in favor of the Day girl." The choice would seem obvious. Pinkie Whittle's husband was a nuisance around the mill. The Martel Mills probably would have been highly pleased if the Whittle family left the mill-town. The moral conditions prevailing in their home were at least questionable. The action of the Martel Mills in discharging Pinkie Whittle does not evince a discrimination aimed at discouraging membership in the Local.

■ The Supreme Court stated in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 497, 83 L.Ed. 627, 123 A.L.R. 599: "* * * the fundamental policy of the Act is to safeguard the rights of self-organization and collective bargaining, and thus by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act." It is our function to see that these rights guaranteed by the Act are amply secured to the employee. But in our effort to prevent the proscribed unfair labor practices, we must be mindful of the welfare of the honest employer.

■ "The National Labor Relations Act was not intended to empower the Board to substitute its judgment for that of the employer in the conduct of his business. It did not deprive the employer of the right to select or dismiss his employees for any cause except where the employee was actually discriminated against because of his union activities or affiliation. * * * *The Act does not vest in the Board managerial authority.*" (Italics supplied.) Garrecht, C. J., in National Labor Relations Board v. Union Pacific Stages, 9 Cir., 99 F.2d 153, 177.

■ Under a system of free enterprise, amended by a statute which seeks to attain an equality of contract and of justice through the protection of the employees' right to bargain collectively, we must not destroy those liberties which are distinctive to our type of economy. The employer must be permitted to discharge the inefficient, the irresponsible, the disobedient, the immoral. "The petitioner is at liberty,

whenever occasion may arise, to exercise its undoubted right to sever his relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the act declares permissible." Associated Press v. National Labor Relations Board, supra, 301 U.S. at page 132, 57 S.Ct. at page 655, 81 L.Ed. 953. The mere existence of union affiliations, though these affiliations be material in nature, does not leave the employee free from the consequences of his indiscretions and failings. Where economic considerations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. It would be an abuse of the terminology of the Act if an employer were obliged to discriminate in favor of union men as against non-union men through fear of action by the Board and the courts. Cf. Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 957; Appalachian Electric Power Co. v. National Labor Relations Board, supra, 93 F.2d at page 989.

■ Our conclusion that there is not substantial evidence to support the Board's findings as to discrimination in violation of Section 8(3) of the Act makes it unnecessary for us to consider the question of whether the alleged discriminations did actually discourage membership in any labor organization.

■ The Board made the additional finding that the Martel Mills interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act, thus violating Section 8(1) of the Act. We are convinced, for the reasons stated above, that there is no substantial evidence to sustain this finding. The Board relies upon three separate conversations—one, between Rush and Schwartz; another, between Rush and Waits; the third, between Rush and a former employee. The first two conversations have already been discussed. As to the last-mentioned conversation, Rush is quoted as having said that he did not "approve of members of the union going around from place to place and antagonizing other people who don't belong to it and soliciting their membership." Rush testified that this conversation merely expressed his interest in keeping down disturbances. In the absence of evidence of

634

any policy of proscribed discrimination, an employer should not be held strictly accountable for every isolated utterance of a policy-making officer concerning union activities. Cf. National Labor Relations Board v. Union Pacific Stages, supra, 99 F.2d at pages 178, 179; Jefferson Electric Co. v. National Labor Relations Board, supra, 102 F.2d at page 956. And, where the conduct and actions of the employer fail to indicate any violation of the Act, an assemblage of unrelated, unconnected expressions of opinion does not very deeply impress this Court.

Two very recent cases, both decided since the argument of the instant case, would seem to throw light on our problem. In Foote Bros. Gear & Machine Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611, decided July 24, 1940, the factual set-up bore very striking similarities to the Martel situation. Circuit Judge Evans, speaking for the Circuit Court of Appeals of the Seventh Circuit, set aside (as not supported by substantial evidence), the National Labor Relations Board's finding that certain employees had been discharged through unfair labor practices because of union activities. Judge Evans, in his opinion, took occasion to point out: (1) That the Circuit Court of Appeals, in determining whether such a finding by the Board is supported by substantial evidence, must undertake "an analysis which to a certain extent is a weighing of such evidence"; (2) that a statement by a witness "which alone may afford substantial support for a fact finding may lose its weight entirely in the face of uncontradicted facts inconsistent with it." However, a similar finding of the Board was sustained by the Circuit Court of Appeals for the Eighth Circuit in National Labor Relations Board v. Viking Pump Co., 113 F.2d 759, decided July 29, 1940. In the Viking Pump case, though, the evidence showed a clear, open and avowed hostility to the union on the part of the employer. Indeed, the employer's foreman had gone so far as to warn the employees that the employer would close the plant unless the employees ceased their union activity and immediately elected a bargaining committee. No evidence of any such attempted coercion is present in the instant case. Furthermore, evidence of the existence of valid reasons for the discharge or refusal to re-employ particular employees is much clearer and certainly more cogent in the instant case, than in the Viking Pump case. On these grounds, we think this latter case can very easily be distinguished.

For the foregoing reasons, the order of the Board is set aside and the petition to enforce it is dismissed.

Reversed.