# NATIONAL LABOR RELATIONS BOARD v. ENTWISTLE MFG. CO.

## No. 4770.

Circuit Court of Appeals, Fourth Circuit.
June 10, 1941.

Walter B. Wilbur, of Washington, D. C., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Sylvester Garrett, and William Stix, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Whiteford S. Blakeney, of Charlotte, N. C. (Fred W. Bynum, of Rockingham, N. C., L. P. McLendon, of Greensboro, N. C., and Guthrie, Pierce & Blakeney, of Charlotte, N. C., on the brief), for respondent.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

The National Labor Relations Board (hereinafter called the Board) has petitioned this court to enforce an order issued against the Entwistle Manufacturing Company (hereinafter called respondent) pursuant to Section 10(c) of the National Labor Relations Act (hereinafter called the Act), 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

Upon the usual proceedings pursuant to section 10 of the Act, the Board, on May 22, 1940, issued its findings of fact, conclusions of law, and order. In addition to its jurisdictional findings, the Board found that respondent, in violation of section 8 (1) and (3) of the Act, had discharged Simon W. Rainwater because of his membership and activity in the Textile Workers' Union of America (hereinafter called the Union), an affiliate of the Congress of Industrial Organizations (hereinafter called C. I. O.). Respondent was ordered to cease and desist from its unfair labor practices, to reinstate Rainwater with back pay, and to post appropriate notices. In support of its petition for enforcement of the above order, the Board maintains that (1) its findings of fact with respect to the unfair labor practices are supported by substantial evidence and that (2) its order, with a modification to which there is consent, is valid and proper.

Respondent, a North Carolina corporation, is engaged in manufacturing cotton cloth. It operates three plants at Rockingham, North Carolina, each plant being in close proximity both to the others and to neighboring cotton mills. Ninety-nine percent of its finished products were shipped, in 1938, to destinations outside the state of North Carolina.

In 1932, a group of respondent's employees made the first significant attempt

to organize by forming an independent union known as the Richmond County Textile Workers Association. Soon after the formation of this organization, a dispute over working conditions arose and the plants were accordingly shut down for a period of about eight weeks. Robert C. Heyward, the superintendent of two of the three plants, helped to organize a group, known as the "Loyal Workers", which had for its sole aim the reopening of the mill. Food supplies from the company stores were given to the "Loyal Workers", while the opposition group, the "strikers", received aid only from outside sources. When the plant finally reopened, an express condition of re-employment was that the employees adopt the basis of settlement suggested by Governor Gardner of North Carolina and "drop the union and forget it." A few days after the reopening, Superintendent Heyward instructed all former union members that a meeting was to be held at a local church. Heyward presided at the meeting and undertook to explain to this group his "view of the Governor's proposition" requiring them to give up all union activity.

The second serious attempt at union organization was made in 1934, when an open-air meeting was held for the purpose of electing officers of a union affiliated with the American Federation of Labor. No activity followed this meeting until, in the latter part of 1938, an affiliate of the C. I. O. began to organize all the cotton mills in Rockingham. A number of respondent's employees secretly joined this organization within a few weeks. Rainwater was among these employees. To further the development of this nascent group, an organizer, Homer Welch, was assigned to the Rockingham District and, on April 15, 1939, a local charter was granted to the member-workers.

Rainwater was hired early in 1933 as a weaver. Three or four years later he was promoted to the position of "smash hand". It is conceded by respondent's witnesses that he was a "very good smash hand." Rainwater testified that he had joined the Union on August 20, 1938, when it was first being organized. At first he refrained from taking a prominent part in its affairs. However, about the middle of January, 1939, he was elected a member of the Union steering committee. This post in the Union required Rainwater to "get out and solicit membership" and to work closely with Welch, the organizer for the Union. As Rainwater was the only one of respondent's employees elected to the steering committee, he obviously took a more active part in Union affairs than respondent's other employees. On cross-examination, he testified that he had procured seven or eight memberships among his fellow employees and had discussed the Union with several others.

Rainwater was discharged on January 27, 1939, within two weeks after his election to the steering committee and exactly six days after he had attended a Union meeting in the local courthouse. In its complaint filed with the Board, the Union alleged that respondent had discharged, and thereafter refused to reinstate, Rainwater because of his Union activities. Respondent, on the other hand, has consistently maintained that Rainwater was discharged to make room for the rehiring of Ed Freeman, a former employee who had previously been discharged because of drunkenness. In support of respondent's position, respondent's officials testified that Freeman had been rehired because of their sympathy for Freeman's wife and child; that Freeman had for six weeks replaced an oiler, Albert Ray, who was temporarily ill; that Ray's return had caused an oversupply of labor at the plant; and that Superintendent Heyward had chosen Rainwater as the employee to be displaced. To fit Freeman into the organization, respondent returned Ray to his regular position of an oiler, transferred Freeman to a warp-tieing job in place of one Davidson, and transferred Davidson to Rainwater's job. It was maintained by respondent that it had no knowledge of Rainwater's Union membership and activity at the time of his discharge; that, in deciding which employee to discharge, it had considered, as to each employee, his family and home responsibility, also, the number of persons per family working for the respondent; that the evaluations made of Rainwater's efficiency, ability, and conduct were important factors leading to his discharge; that his "physical condition" was a factor contributing to his discharge.

In support of the Board's contentions, there is evidence to show that Rainwater lived with and helped to support a blind cousin, a widowed aunt, and an aged grandfather; that Superintendent Heyward's house was situated directly behind the house of Rainwater; that Heyward

had seen the blind cousin, although he denied knowing who the blind man was; that Rainwater was a "good smash hand and a fair weaver"; that four days after Rainwater's discharge an employee named Marion Dutton was rehired after an absence of several months; that it was not necessary to discharge anyone to make room for Dutton; that, three weeks after Dutton was rehired, another man, Harry Rivers, was hired; that Rivers was an unmarried man who, like Freeman, had been discharged at a previous time for drunkenness; that, although Rainwater wore glasses, he had always worn them throughout his employment with respondent without any adverse effect upon his work. Two employees of another mill, both of whom are members of the Union, testified that in a conversation held with H. G. Bunn, the overseer of the weaving room in which Rainwater worked, Bunn stated that "If Rainwater had stayed out of the union he would have been working today." Bunn admitted that he had held a conversation with these men, but denied that he had made the quoted statement. Both the Trial Examiner and the Board found that Bunn had made the statement.

■ We are of the opinion that the Board has sustained its burden of proof and that its findings of fact are supported by substantial evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N. L. R. B., 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. See Martel Mills Corp. v. N. L. R. B., 4 Cir., 1940, 114 F.2d 624, 627, 628. As this court stated in the Martel Mills case, supra, 114 F.2d at page 631: "We do not lose sight of the fact that our inquiry is centered upon the motivating cause of the employer's action. The task is a difficult one. It involves an inquiry into the state of mind of the employer. Such inquiry is laden with uncertainties and false paths. Obviously our chief guide is the words of the witness under oath who undertook to disclose the workings of his mind. If his explanation is a reasonable one, the onus is upon the Board to establish the falsity of his explanation and the truth of its own interpretation."

We believe that in the instant case the evidence presented by the Board made out a prima facie case against respondent of discrimination in violation of section 8,

(1) and (3) of the Act. We further believe that there was substantial evidence to support both the Board's rejection of respondent's explanation of Rainwater's discharge and the Board's finding that Rainwater had been discharge because of his membership in the Union.

■ In reference to the remark alleged to have been made by H. G. Bunn, respondent argues in its brief that "a supervisory employee * * * cannot declare a past act of his employer to be a violation of the law and thereby visit legal consequences upon the employer." We do not believe, however, that the Board based its findings of discrimination solely on Bunn's alleged statement. Under section 10(b) of the Act, this evidence was clearly admissible and, while its probative value might not have been very high, it was eligible for consideration as a part of "the whole congeries of facts" relating to the dismissal. N. L. R. B. v. Link-Belt Co., 1941, 311 U.S. 584, 61 S.Ct. 358, 361, 85 L. Ed. ——. This type of evidence, similar to the evidence of respondent's labor-history prior to the passage of the Act, is but of general aid in the determination of an employer's dominating intention. Cf. N. L. R. B. v. Link-Belt Co., supra; Martel Mills v. N. L. R. B., supra, 114 F.2d at page 628.

■ Respondent offered testimony to prove that it had no knowledge of Rainwater's membership in the Union. The Board, on the other hand, had before it all the evidence tending to indicate that Rainwater, alone, out of all respondent's employees, was singularly outstanding in Union affairs. Corbett Jones, one of respondent's employees, testified that he had seen the automobile of Welch, the union organizer, parked in front of Rainwater's house, and that he had seen Rainwater and Welch talking together. Although this testimony is far from being conclusive, we do think that it tends to support the conclusion that, in this small mill-town, Rainwater's Union activities were revealed to both the employees and respondent. We believe that there was sufficient evidence to support the finding that respondent had knowledge of Rainwater's Union activities. At all events, the "Board was justified in relying on circumstantial evidence of discrimination and was not required to deny relief because there was no direct evidence that the employer knew" of the Union connections. N. L. R. B. v. Link-Belt Co., supra, 311 U.S. 584,

61 S.Ct. at page 367, 85 L.Ed. ——. The Board aptly stated in its brief: "That respondent on its own initiative should undertake to transfer two men to new, unfamiliar jobs, and discharge a third highly capable employee, in order that a temporary employee who had not requested that his employment be extended should be retained, is singularly curious conduct contrary to normal behavior."

Inasmuch as there is no evidence of a reasonable explanation for Rainwater's discharge, the conclusion is clearly suggested that respondent knew of Rainwater's Union activities and had therefor effected his discharge. The fact that respondent had offered Rainwater a temporary weaving job on the third shift, subsequent to the filing of charges with the Board, falls far short of establishing the good faith of its actions. Cf. N. L. R. B. v. Vincennes Steel Corp., 7 Cir., 1941, 117 F.2d 169, 173.

It must be remembered that respondent employs five hundred persons in the plant here involved and a total of twelve hundred persons in its three Rockingham plants. Nevertheless, without claiming that a reduction of staff was required by any diminution of its business, respondent avers that in January, 1939, it was compelled to discharge a lone employee for the claimed purpose of giving employment to more "destitute" inhabitants of its houses. Yet, Superintendent Heyward must have known of Rainwater's pressing family obligations. Yet, four days after Rainwater's discharge, Marion Dutton was rehired after an absence of several months. Yet, three weeks later, no further discharges were necessary to allow for the rehiring of Harry Rivers. Rainwater had been singled out for the discharge although there were at least ten unmarried employees in respondent's weaving room, including four single members of one family.

Circumstantial evidence must, of course, be weighed with caution. Yet, when the strands of such evidence are of sufficient quantity and proper quality, these strands, as in the instant case, make up a rope that is strong enough in probative force to constitute at least substantial evidence that will justify the Board's findings. In that connection, respondent stoutly maintains that the evidence must show that Rainwater's Union activities were the motivating reason that brought about his discharge, and that respondent need not prove why the discharge took place. True enough, respondent could have dismissed Rainwater for silly and inconsequential reasons, such as the color of his hair or the wearing of celluloid collars, and this would not have been an unfair labor practice. But, when there is substantial evidence, direct or circumstantial, to indicate that an employee was discharged because of his Union activities, a very definite burden is imposed upon the employer to prove the existence of a reason, not within the prohibitions of the Act, sufficient in itself to warrant or justify the discharge. And, certainly, when the employer fails in his undertaking to prove such a reason, the employer is not thereby in a favorable position to question the Board's findings of discrimination.

Paragraph 1 (a) of the Board's order specifically directs respondent to cease and desist from discouraging membership in the Union or any other labor organization by discriminating in regard to hire or tenure, or any other term or condition of employment. Paragraph 1(b) is a blanket order enjoining respondent from in any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed by section 7 of the Act. We believe that a discriminatory discharge of an employee because of his union affiliations goes to the very heart of the Act. Here, there was evidence of more than an isolated act in violation of the right of self-organization; for, as the Board found, respondent was actually guilty of violating the broad provisions of section 8 (1) of the Act. The instant case seems to fall within the terms of the rule recently stated by Mr. Justice Stone in N. L. R. B. v. Express Publishing Co., 1941, 61 S.Ct. 693, 699, 700, 85 L.Ed. ——, that "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." We therefore are of the opinion that such specific violations of section 8 (1) and (3) justify the blanket order. Cf. American Enka Corp. v. N. L. R. B., 4 Cir., 119 F.2d 60, decided by this court on April 7, 1941, see (1941) 27 Va. L.Rev. 956, 957. But cf. N.L.R.B. v.

Swift & Co., 7 Cir., 1940, 108 F.2d 988, 990; Globe Cotton Mills v. N. L. R. B., 5 Cir., 1939, 103 F.2d 91, 94.

Paragraph 2 (b) affirmatively provides, inter alia, that respondent shall deduct from the back pay due Rainwater any sums received by him for work performed upon work-relief projects and shall pay over such sums to the appropriate governmental agencies. Inasmuch as this type of provision was held invalid in Republic Steel Corp. v. N. L. R. B., 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——, we will modify paragraph 2 (b) by striking from it the words beginning with "and pay over" and ending with "work-relief projects".

For the reasons stated above, the order of the Board will be modified and, as thus modified, will be enforced.

Modified and enforced.