**MAPHIS CHAPMAN CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 9920.

United States Court of Appeals Fourth Circuit.

Argued Oct. 5, 1965.

Decided Nov. 2, 1966.

---

James A. Harper, Jr., Richmond, Va. (Francis V. Lowden, Jr., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for petitioner.

Paul M. Thompson, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Atty., National Labor Relations Board, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

Maphis Chapman Corporation (hereinafter "company") petitions this court to review and set aside those portions of a decision and order of the National Labor Relations Board which adjudge it guilty of unfair labor practices subsequent to October 23, 1963. The Board counters by asking that its order be enforced.

The company does not contest the Board's findings that prior to October 23, 1963, it violated sections 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1) and (3) (1964), by discriminatorily discharging, coercively interrogating and threatening reprisals against certain of its employees in an effort to thwart the union's [1] organizational campaign which had been initiated in the plant only shortly before. The company contends, however, that it "came clean" on October 23, 1963, and that it has not breached any provision of the Labor Act since that time. On the date mentioned the company sent identical letters to all but two of the discharged employees requesting that they return to work as soon as possible. Obviously, the company did not "come clean" insofar as it refused reinstatement to two of the discharged employees, Dovel and Housden. However, the Board has ordered their reinstatement with back pay and interest, and the company does not contest this aspect of the Board's order.

The Board's findings of unfair labor practices which the company attacks as erroneous are:

(1) that the company violated section 8(a) (1) of the Act by reason of statements by its managerial and supervisory staff which interfered with the rights of its employees to engage in concerted activities;

(2) that the company violated sections 8(a) (1) and (5) of the Act by refusing to recognize and bargain collectively with the union; and

(3) that the company violated sections 8(a) (1) and (3) of the Act by discharging employees Joseph Rinaca and Keith Lucas on December 13, 1963, because of their union activities.

With respect to the first issue, examination of the record as a whole convinces us that the Board's determination that the company's agents made coercive statements which interfered with their employees' organizational rights is clearly supported by substantial evidence. Nothing would be gained by a detailed discussion of the content of the statements. Although the company's agents denied making some of the statements attributed to them, the Trial Examiner credited the conflicting testimony. The statements tended, in effect, to discourage union activity. Enforcement of the Board's order is granted insofar as it requires the company to cease and desist from in any manner interfering with, restraining or coercing its employees in the exercise of their rights to organize and participate in union activities.

The other two issues before us—the refusal to bargain and the discharge of Rinaca and Lucas—require more extended discussion.

### Refusal to Bargain

By a letter dated October 28, 1963, the union demanded that the company recognize it as the exclusive bargaining agent of the company's production and maintenance employees. The union offered to prove its majority status by submitting signed union authorization cards to a mutually acceptable neutral third party for comparison with the company's payroll. In its reply letter dated October 31, 1963, the company advised the union that it did not believe a majority of its employees desired the union to represent them and that the union would not be recognized as bargaining representative except upon certification as such by the Board.

1. The union involved is the International Brotherhood of Boilermakers, Iron Ship-builders, Blacksmiths, Forgers and Helpers, AFL-CIO.

The union did not then file a refusal-to-bargain charge but acceded, temporarily, to the company's suggested method of determining exclusive representation rights and filed a petition with the Board on November 6, 1963, seeking certification with respect to a unit composed of the company's production and maintenance employees. Extensive hearings in the representation case were held on December 11, 1963, and February 27, 1964. The principal issue there presented and determined concerned the composition of the appropriate unit for bargaining purposes.

At this point it appears highly pertinent to note the seasonal nature of the company's business and the effect thereof upon company employment practices. The company is engaged in the manufacture and distribution of steel storage tanks for oil and gas. Roughly two-thirds of its yearly production occurs during a peak season normally extending from about the first of May until the first or middle of December. During this period each year it is necessary that the company substantially increase its work force in order to meet the increased production demands. The company maintains a complement of thirty-five or forty "permanent" production and maintenance employees who work the entire year. The parties agreed that these employees are properly included in the bargaining unit. Peak season demands require expansion of the work force to approximately sixty employees. These employees were sometimes indiscriminately referred to during the representation proceedings as "seasonal" or "temporary" employees. It is uncontroverted, however, that there were two distinct groups of employees within this category. Some employees returned year after year to work during the peak season and these are true "seasonal employees." But it is clearly established that there were seldom enough seasonal employees, or those returning year after year, to meet labor needs. Consequently, in years past the company hired a great number of employees who worked only one season or a part thereof. These em-ployees have frequently been referred to by the parties as "drifters." The company's general manager testified in the representation case, without contradiction, that these one-time employees would often work for only a couple of days or a week. This fact is emphasized by his further uncontradicted testimony to the effect that, of the total of 164 different persons who were employed at any time during the years 1960–63, 109 worked no more than one season.

The sole issue in the representation case was whether the true seasonal employees should be included in the bargaining unit. The union conceded that the "drifters" did not have a sufficient community of interest with the permanent employees to be included in the same unit with them. At the February 27, 1964, hearing the union's counsel made the following statement:

> "MR COHEN: * * * And, incidentally, I would like to add there—as long as we are speaking about exactly who is in issue—I think we are talking about these people who worked in the summer of '63 who had been there before, perhaps some who had not. We are not talking about some individuals, and I do not deny they existed or exist, of someone who comes in for a very short temporary period or who comes and leaves and is never heard of again. They obviously have no community of interest here."

The Hearing Examiner responded: "Certainly not."

In its subsequent brief to the Board, the union strongly reiterated its position on this matter:

> "In this regard the distinction drawn by the Board in the *Gray* case between seasonal employees, on the one hand, and casual or 'extra' employees, on the other, is worthy of some attention. It seems clear that the 'drifters' in this case are comparable to the extras in the *Gray* case * * *. Certainly, no contention is raised herein that these drifters or one-time employees are true seasonal employees or should be includ-

ed in the unit. They are properly to be excluded, as have been students, housewives and migrants in other Board decisions. See Bear Creek Orchards, 87 NLRB 1348 (1949); Libby, McNeill and Libby, 64 NLRB 1329 (1945); Hunt Foods, Inc., 68 NLRB 800 (1946)."[2]

On March 27, 1964, the Regional Director issued a Decision and Direction of Election in the representation case. He concluded that "all seasonal employees" of the company had a sufficient community of interest in the employment conditions to warrant their inclusion in the bargaining unit. The decision made no reference to the "drifters" and did not undertake to ascertain or point out which employees were "seasonal." While the Director's sweeping reference to "all seasonal employees" might, on a superficial reading, be interpreted as indicating that even the "drifters" were to be included within the unit, such a construction would be utterly unreasonable in view of the union's concessions. Therefore, we assume that the Regional Director, in determining that "all seasonal employees" should be included in the unit, was referring only to the true or regular seasonal employees.

The election ordered by the Regional Director was never held. On April 1, 1964, the union filed an amended unfair labor practice charge alleging, inter alia, a refusal to bargain in violation of section 8(a) (5) and (1). On May 14, 1964, a complaint against the company issued on the charge. Shortly thereafter, the Regional Director granted the union's request for withdrawal of its petition for certification.

The complaint case was heard on July 14 and 15, 1964, by a Trial Examiner who found that there were sixty-five production and maintenance employees on the company's payroll as of October 28, 1963, the date on which the union had demanded recognition, and that the union had obtained valid authorization cards

from thirty-five of those employees. On this basis the Examiner concluded that the union had achieved majority status, albeit by a very narrow margin, at the time recognition was refused. Upon his further finding that the company had no good faith doubt as to the union's majority status, the Examiner held that violations of section 8(a) (5) and (1) had occurred. This ruling was affirmed by the Board.

■ It is beyond cavil that, irrespective of the employer's subjective thoughts, no violation of section 8(a) (5) occurs where the union does not in fact enjoy majority status in the appropriate unit. See, e. g., Edward Fields, Inc. v. NLRB, 325 F.2d 754, 761 (2 Cir. 1963). Actually, an employer commits an unfair labor practice if he recognizes a minority union. International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). In the instant case there was no proof that the union ever obtained the required majority status. Once again a concession, this time by the General Counsel, makes this fact crystal clear. While the General Counsel introduced evidence of majority support for the union in the company's total work force on October 28, 1963, *he conceded that the company's payroll on that date included an undetermined number of "drifters," whose exclusion from the bargaining unit was established in the representation case.* Immediately after General Counsel had proposed that it be stipulated that a list of persons introduced by him comprised the company's entire payroll on the critical date, the following exchange occurred:

"MR. HARPER [counsel for the company]: Well, there is one classification I think we want to add to this. This list includes all production and maintenance employees and truck drivers on the payroll on October 28th, and includes the Employer's regular, permanent employees, its seasonal employees, and its temporary employees.

2. The "*Gray*" case is P. G. Gray, 128 N.L.R.B. 1026 (1960).

"MR. WESTCOTT [counsel for the General Counsel]: You are distinguishing between temporary and seasonal?

"MR. HARPER: There was a distinction between the two in the RC-case. There will be discussion of that later.

"MR. WESTCOTT: Is that stipulation acceptable to you?

"MR. HARPER: Yes.

"TRIAL EXAMINER: Is it acceptable to you as modified?

"MR. WESTCOTT: Yes.

"TRIAL EXAMINER: All right."

In view of the distinction which was made in the representation case, counsel could only have been referring to the "drifters" when they spoke of "temporary employees." Despite this stipulation, no evidence was introduced to show how many of the thirty-five card signers and the sixty-five employees on the payroll were members of the proper unit.

■ The burden of proving majority status within the bargaining unit rested upon the General Counsel.[3] The Board's finding that the union enjoyed majority support is without adequate support in the record. Certainly, if the company's refusal to bargain did not violate section 8(a) (5), neither did it violate section 8(a) (1). No citation of authority is needed to support this proposition beyond a reference to International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, supra.

Since the General Counsel has failed to carry the burden on this critical point, the majority status of the union, we have no occasion to consider whether the employer has a good faith doubt as to the union's majority. Enforcement of the Board's bargaining order is denied.

### Layoff of Rinaca and Lucas

On December 13, 1963, the company laid off approximately twenty-two employees, including Rinaca and Lucas. With the exception of these two individuals and a third employee, whose layoff the Board ultimately found was not discriminatorily motivated, General Counsel conceded that the layoffs were prompted solely by economic considerations. As previously shown, it was the company's practice to lay off all seasonal employees at the end of the peak season about the first or middle of December of each year.

■ The crucial element in any section 8(a) (3) violation[4] is discriminatory motivation. NLRB v. Brown, 380 U.S. 278, 286–287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Despite the fact that no evidence was adduced to show that the company retained, to perform the work done by Rinaca and Lucas, any employee with less seniority or aptitude than either of them possessed, there is circumstantial evidence tending to show that the layoff of the two employees in question was retaliatory because of their union activities. Both Rinaca and Lucas were among that group of employees who were discharged in October of 1963. Both were recalled by the company's letters of October 23, 1963. The company has not contested the claim that these discharges were motivated by hostility toward the union. Evidence of prior unfair labor practices is relevant in determining motivation underlying subsequent conduct by an employer. See Paramount Cap Mfg. Co. v. NLRB, 260 F.2d 109, 112–113 (8 Cir. 1958); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139–140 (1 Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139,

3. See Strydel, Inc., 61 L.R.R.M. 1230 (1966), where the Board states:

"Pursuant to settled Board policy, the General Counsel, having alleged a violation of Section 8(a) (5) on the basis of a card showing, has the burden of proving *not only that valid authorizations have been executed by a majority*, but also that the employer has refused recognition in bad faith." (Emphasis added.)

4. The accompanying section 8(a) (1) violation found by the Board stands or falls in accordance with the disposition of the 8(a) (3) claim.

98 L.Ed. 391 (1953). Such evidence is particularly relevant in the instant case due to the short period of time intervening between the prior discharges and the layoffs under consideration.

There can be little doubt that the adherence of Rinaca and Lucas to the union was known to the company. On October 16, 1963, a charge filed against the company alleged that it had discharged Lucas because of his union activities. This would seem to be a clear notice to the company of his union leanings. There is independent evidence that Rinaca's feelings with respect to the union were also known to the company. He testified at the hearing that, in the course of an interrogation by company president Maphis, he admitted his participation in the organizational effort. Maphis did not contradict this testimony and it was credited by the Examiner.

■ In addition, we have already found substantial evidence in the record to show that the company was guilty of violations of section 8(a)(1) after October 23, 1963, the date on which it claims to have ceased engaging in any proscribed conduct. These instances of section 8(a)(1) violations occurred both before and after the December 13 layoffs. The conclusion is inescapable that the company's attitude toward the union was one of animosity and hostility at the time of the layoffs in question. The significance of such bias in determining an employer's motive for conduct which allegedly violates section 8(a)(3) has been recognized by the courts. See NLRB v. Dan River Mills, Inc., 274 F.2d 381, 384 (5 Cir. 1960); NLRB v. Chicago Apparatus Co., 116 F.2d 753 (7 Cir. 1941).

■ The coalescent factors—the company's antiunion bias, its knowledge of the union activities of Rinaca and Lucas and its prior discrimination

against them—were sufficient, in our view, to establish *prima facie* violations of section 8(a)(3) and, in order to overcome the resulting presumption of discrimination, the company must assume the burden of showing a justifiable or nondiscriminatory reason for the layoffs. NLRB v. Entwistle Mfg. Co., 120 F.2d 532, 536 (4 Cir. 1941). If the company has met this burden enforcement of the Board's order should be denied. However, where the Board's finding of discriminatory motivation is supported by substantial evidence on the record as a whole, the order should be enforced. In making this determination, any evidence in the record which contradicts or detracts from the Board's finding is properly to be considered. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In cases where the record reveals a legitimate and nondiscriminatory reason for the layoff of an employee, mere circumstantial evidence of discriminatory intent is often outweighed or diminished to the point that it cannot reasonably be deemed "substantial" in the *Universal Camera Corp.* sense. On the other hand, the failure of an employer to establish a justifiable reason for the layoff gives rise to an adverse inference against him. See NLRB v. Entwistle Mfg. Co., supra.

The explanation tendered by the company for the layoff of Rinaca and Lucas was the same as the one which the General Counsel accepted with respect to most of the employees laid off on December 13, that is, that their services were no longer needed because the peak season was at an end. The Board rejected this explanation as to Rinaca and Lucas because, at one point or another, the company's general manager, who testified as to their employment status, had characterized them as "permanent" rather than seasonal employees.[5] We are

---

5. The Examiner found that Lucas had not been discriminatorily discharged for the reason that the company's general manager testified in the unfair labor practice case, without contradiction, that Lucas did not have "permanent" status with the company. The Examiner overlooked the contradiction of this statement which was contained in the general manager's testimony in the representation case, which was made a part of the record in the complaint case and which was used to impeach the general manager's testimony therein. The Board relied upon the gen-

reluctant to regard this testimony as decisive of the question and to accept the "label" as binding, as did the Board, without examining into the exact nature of the employment status of Rinaca and Lucas as disclosed by the evidence.

Both were employed during the peak season of 1962 and were retained over the winter, or slack season, of 1962–63. Thus, since they had survived a seasonal layoff, they might, in one sense, be characterized as "permanent." However, the general manager gave other testimony which indicated that in reality both Rinaca and Lucas, irrespective of the label which may have been applied, were for all relevant purposes the *equivalent* of seasonal employees, if not in fact. During the slack season of 1962–63, the company was in the process of building a new plant and was using certain of its own employees on this project. The general manager testified that the only reason for retaining Rinaca and Lucas during the winter of 1962–63 was to use them on this nonrecurring construction work. If it be true that the two employees were not retained for production or maintenance work during that period, there is no meaningful distinction, for our purposes, between their status and that of the "seasonal" employees whose layoff for economic reasons is not attacked.

Proceeding on this basis, we grant enforcement of the Board's order insofar as it concerns Rinaca and deny enforcement insofar as it affects Lucas. Both men were cross-examined with re-

spect to the nature of their work for the company during the slack season of 1962–63. Rinaca admitted that he worked on the construction of the new plant at certain times during that winter but stated that his work in that area was of short duration. He testified that at other times during the winter he worked as a welder on production which was his job during the peak seasons. Thus, there was a conflict in the evidence which the Board could reasonably resolve against the company. We cannot say that the Board's rejection of the company's explanation for Rinaca's layoff was unsupported by substantial evidence.[6]

Lucas testified unequivocally that he worked on the construction project during the winter in question. There is nothing in the record to indicate that he worked on production at any time during the slack season and we have no basis on which to assume that he did so merely because of Rinaca's testimony with respect to his own work experience during that time. Since the testimony of the alleged discriminatee himself does not contradict the company's explanation of his layoff, we must regard the claimed justification therefor as having been proved. In view of this evidence of justification for the layoff and the highly circumstantial nature of the evidence against the company, we are not persuaded upon the whole record that the Board's finding of discrimination with respect to Lucas is supported by substantial evidence.

Enforcement granted in part and denied in part.

---

eral manager's statement in the representation proceeding in modifying the Examiner's decision and ordering the reinstatement of Lucas as well as Rinaca.

6. The company also attempted to justify its layoff of Rinaca on the ground that he was an unsatisfactory employee. The evidence showed that Rinaca had been warned on one occasion about inadequate production. However, the Examiner took

the view that this incident was not of sufficient gravity and was too remote in point of time to justify Rinaca's layoff on December 13. We think the Examiner's conclusion was supported by substantial evidence. Moreover, we note the presence in the record of evidence, not relied upon by the Examiner, that Rinaca had been informed by the company that the warning was a mere technicality and that his work was satisfactory.