**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LYMAN PRINTING CO., Inc., Respondent.**

**No. 10050.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 10, 1965.

Decided Feb. 28, 1966.

---

J. Spencer Bell, Circuit Judge, dissented.

Morton Namrow, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., National Labor Relations Board, on brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Ernest W. Machen, Jr., and Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

The National Labor Relations Board prays enforcement of its order finding Lyman Printing & Finishing Company guilty of unfair labor practices as defined in section 8(a) (1) and (3) of the National Labor Relations Act, directing desistence in the future and requiring immediate reinstatement of six discharged employees. 150 NLRB No. 66, December 30, 1964; 29 U.S.C. 158(a) (1) and (3). Resisting, the company denies the existence of the requisite evidential foundation for the decision. Our task is to measure the proof against the standard of substantial evidence "on the record considered as a whole." Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The section 8(a) (1) violations—unfair interference, restraint and coercion—consist of a mailed and posted warning to the employees of serious harms from unionization and the interrogation of the employees in regard to union activities; the section 8(a) (3) and (1) breaches are the allegedly discriminatory discharges of six employees because of union affiliation. These are the findings of the examiner; all of them were adopted by the Board.

Lyman's response is that the warning notice was protected by section 8(c)—allowing freedom of expression—and that the questioning was solely to ascertain if employees were engaging in union membership solicitation during working hours. The company categorically disavows discrimination in the discharges. It insists that all of these releases were due to infractions of non-discriminatory company rules against such solicitation and forbidding employees to roam about the plant away from their stations, or were due to poor workmanship and attitudes.

Lyman, incorporated and located in South Carolina, processes, finishes and manufactures cotton and synthetic textile products. There are 2000 employees in

the finishing department, with which this case is concerned, and 3000 throughout the entire plant. In August 1963 the Textile Workers Union of America, AFL-CIO, commenced the organization of Lyman's employees with an initial meeting on Sunday, August 18, 1963.

The mailed and posted notice contained the following paragraph:

"(1) Whether this Union shall come in at Lyman is, of course, a subject of concern to this Company. It is equally, however, a matter of serious concern to you, and our sincere belief is that if this Union were to get in here, it would not work to your benefit, but, in the long run, would itself operate to your serious harm."

■ Nothing in this wording do we find to exceed the bounds of section 8(c) granting an employer the right to express and disseminate its views on unionization. There is no threat or promise. The statement is not what the employer would do, but what the union would do if it entered the plant. A like publication was declared unobjectionable in Wellington Mill Division, etc. v. NLRB, 330 F.2d 579, 583 (4 Cir. 1964).

■ Coercive interrogation is listed by the examiner. The day following the organizational meeting, Overseer Langston, a supervisor, asked employee Owens whether he had attended the meeting and how many of "our boys were there". At the same time he passed to Owens newspaper excerpts to the effect that the CIO had furnished funds to obtain bail bonds for the "Freedom Riders" participating in racial protestations. Owens was requested to let the other employees read these clippings. Thereafter another foreman asked Owens if he had any union cards and, receiving an affirmative response, asked to see one.

The reference to CIO interest in the "Freedom Riders" was irrelevant and regrettable. However, it was but a minim of anti-union incitement, particularly as it is shown as an approach to only one employee out of 2000 or 3000. Certainly the inquiry as to the possession of union cards was harmless.

Another incident the examiner relies upon was a question by Second Hand Daniels, a supervisor, directed to employee Carlisle asking him to corroborate Daniels' retailed information that employee Williams had offered Carlisle a union card. The query was repeated by another supervisor, Overseer Hemply, the next day in a telephone call to Carlisle. Obviously, the purpose was to ascertain if Williams was recruiting for the union on company time. These inquiries do not mount to the gravity of pressure comprehended in the idea of interference, restraint or coercion.

A third episode was when Overseer Harris met employee Ward at a local launderette. He asked Ward about union advocacy during the second shift of work at the plant. Harris mentioned two or three men, and Ward verified them as attending union meetings or "talking union" in the shop. Ward was also asked if employee Owens, heretofore mentioned, had requested him to sign a union card. This approach by Owens was admitted by Ward, and Harris then urged Ward to sign a statement to that effect, explaining that he wanted to discharge Owens. Upon Ward's refusal, Harris asked Ward to follow him home because a wheel on his car was in disrepair. On reaching Harris' home he offered Ward $20 if he would sign the statement. In our judgment Harris' persistence was an impermissible importunity, but as a lone event of this kind it was hardly enough to convict the company of an 8(a) (1) offense.

■ The discharges comprising the discrimination were of the following employees: J. L. Johnson, R. W. Foster, James V. Shelton, Clara Mae Farmer, Defoix Campbell and Lee Barnett. All of them except Barnett's occurred on August 20, 1963—two days after the organizational meeting—and Lee Barnett's was on September 12, 1963. The evidence in respect to each of them will be recounted seriatim in the light most

favorable to the conclusions of the examiner.

*J. L. Johnson* was discharged for soliciting union cards during his shift and in this manner hindering other employees in their work. Having signed a card at the union meeting on August 18, 1963, he brought a number of blank cards to the plant on the night shift August 19. Johnson denied the distribution of any cards at that time. He was discharged when he came to work the next night. His testimony is, and the examiner finds, that the only card he released was to employee Burdette and that he did not leave his place of work during the shift. Burdette, he says, came to him three times and insisted on having a union card. Johnson maintains he declined each time but finally directed Burdette to get one out of Johnson's lunch box.

Against this testimony is, first, that of Burdette. He states that Johnson came to his work location, about 150 feet from his own, several times that night, insisting that Burdette sign a card and finally thrusting one into Burdette's pocket with a threat of physical violence if he did not sign it. Second Hand McGowan, one of Johnson's supervisors, testified that on the night in question he saw Johnson away from his job conversing with others six or eight times. McGowan had no authority to fire, and accordingly did nothing more than report this conduct to his supervisor, Brock, the next day. Brock fired Johnson immediately. Employee Campbell testified that on this shift Johnson had come over to Campbell's machine and solicited his union membership. He also noticed Johnson away from his work talking to others on the same shift.

Johnson made oath before the South Carolina Employment Security Commission that he had never engaged in any union solicitation whatever. Before the examiner he testified positively that he did engage in union activities, that he had taken some of the blank cards brought from the union meeting on August 18 to the plant and "got some of them signed" the next day.

In these circumstances we do not see how the examiner could discard the testimony of McGowan, Burdette and Campbell in favor of Johnson's word. The record hardly warrants the examiner's finding that Johnson's discharge was because of union interest.

*R. W. Foster* signed a union card on August 19 the day after the organizational meeting, at his machine in the plant. The next night he was discharged for walking about and disturbing others at work. Employee Douglas Farmer reported that Foster on the night of August 19, 1963 approached him in his department and solicited him for union membership. Foster, however, says that Farmer came to his machine. Farmer embodied these facts in a written statement prepared by the company on receiving his report. After admitting the paper into evidence earlier, the examiner later declined to honor it as one signed by Farmer because "it clearly is not Farmer's signature". Later it was agreed by the parties that Farmer had signed it. Despite the agreement, the examiner speaks of the paper in his report as "a document purporting to be the statement of employee 'Farmer' ".

It was further stipulated between the General Counsel of the Board and the company that Foster's supervisor, Gaino, no longer available as a witness, if called would testify that Foster's discharge by him was based on a report from a night supervisor "that Foster was leaving his job and going into other departments" and upon "two reports from other departments that he was interfering with other employees". The examiner declined to "consider himself bound to accept the truth of the matters so stipulated by counsel", because the company had offered no testimony from a night supervisor or from other departments to support Gaino's agreed testimony.

While the stipulation was not of the truth of Gaino's testimony, we see no justification for the examiner's disregard of Gaino's agreed evidence in the absence of any attack whatsoever upon Gaino's ver-

acity. The "whole record" does not warrant the examiner's finding that the discharge was due to Foster's union participation.

*James V. Shelton* attended the first union meeting, August 18, and reported for work the next day on the second shift, bringing with him a number of blank union cards. According to the examiner, Shelton obtained the signature of one employee. Later that day or night,. he worked in the next shift "pushing boxes" from one department to another.

The examiner finds that on the latter shift Shelton asked three employees if they wished to sign cards but none accepted. Shelton conceded that he had gone into widely separated divisions of the plant, particularly the sheet and towel departments, which are "off limits" in another building and closed at night. There are signs along the entrance and at the door of these departments prohibiting entry, considerable pilferage having been committed in these areas. Shelton justified his travel about the plant and entering the forbidden sectors on the ground that he was directed to do so by Paul O. Moore as his "overseer". The uncontradicted evidence established that Moore was simply an hourly employee with no appearance of supervisory authority. Additionally, Moore denied that he had instructed Shelton to go into the out-of-bounds sections, and it was proved that no boxes to be "pushed" were to be found there.

In a pre-hearing affidavit before the Board Shelton made oath that he had procured no signatures on union cards while on these two shifts. Before the examiner he repudiated the pre-hearing statement, admitting that he had not told the truth in the affidavit.

Again it is difficult to see how the examiner could have accepted the testimony of this dischargee against both the word of the company's supervisors that they saw him wandering about the plant and against his own unacceptable explanation. To us it is clear that the company was justified in releasing him for interfering with the work of the other employees.

*Clara Mae Farmer* was dismissed on August 20, 1963, although with long service, for refusal to conform to the use of new equipment which had been installed in the sewing department where she was employed. Early in February 1963 the management commenced a "speed-up" system not readily accepted by the personnel in her department.

She admitted having been reprimanded in February 1963 for participating in a deliberate "slow-down" and also for malingering. Her compensation depended upon the number of sheets she ran through her machine. The less stitches per inch that she put on each piece meant that she could turn out a larger number of pieces. She admitted changing the adjustment of the machine so as to put in fewer stitches than the company had fixed. While reducing the stitches augmented her earnings, it produced unacceptable work.

Just before she was discharged, the company had altered the speed of the machines on three occasions to make "it a little bit easier" for the sewers. The last change was on the day before her dismissal. Informed of their dissatisfaction, the company superintendent voluntarily sent for several of the sewers, including Clara Farmer, to hear their complaints, hoping to set the machines to suit them.

On the day of the discharge, the superintendent at her request conferred with Clara Farmer again. She told him she desired to talk about the "money and the new rate." When he could not meet her wishes, she expressed discontent and said she could make much more money by "selling produce at the Greenville Curb Market". When it appeared he could not "please her or * * * make her happy, and that she had this opportunity to make a lot more money", he told her that "the time had arrived for us to part or separate our relationship".

Because of Clara Farmer's statement to an assistant overseer the day before her discharge that "we are all going to join the Union", the examiner imputes her

discharge to union interest, although she admittedly was not then a member of the union or a sponsor of it. The evidence does not support his conclusion.

*Defoix Campbell* was discharged on August 20 for being "away from his work station and interfer[ing] * * * with the work of others". He was a starch mixer on the first or basement floor of a three-story starch processing section. On the floor above him were the ranges where the finished cloth is starched, and on the top or third floor were the calenders, where it is folded. If starch is not supplied to the ranges as needed, large quantities of material will be damaged and the operation of the ranges and calenders will be suspended for a considerable period. Starch is piped automatically to the ranges on orders called down to the basement through pipes.

On the night before his discharge, Campbell's mixers ran out of starch twice. He first testified that he had not left his work that night, and on his testimony the examiner found his discharge was due to union activities.

Against this evidence is Campbell's later concession that he left his work station some six to twelve times that night. He explains that he was obliged to go to the second floor to ascertain what mixes were needed. Thereafter he acknowledged that requests for mixes were sent down to him. Another excuse was that sometimes he had to go to the warehouse to get the starch ingredients. On the night in question however, he recalls, he did not have to procure any of these materials.

The testimony of other witnesses is that when the ranges supplied by Campbell first ran out of starch in the early morning, the supervisor had to locate Campbell and bring him back to his station. Campbell was also seen going to the calender department on the third floor without any duties there. When the ranges ran out again about five o'clock A.M., the operator himself discovered Campbell talking to employees on the floor above him. Each of these stoppages idled seven or eight employees for at least twenty minutes.

Campbell finally owned he brought union cards to the plant that night and obtained about six or seven signatures in the plant during working hours.

The evidence thus does not justify the examiner in linking Campbell's discharge to unionism.

*Lee Barnett,* on September 12, 1963, with a record of long service, was discharged for failing in his duties of inspection. The day preceding discharge a run of about 800 yards of cloth under his surveillance was later found to be faulty. Such substandard products had raised complaints from customers. So numerous and serious, their letters were posted upon a bulletin board along with the records of the poor workmanship. Admittedly, careless inspections were costly, not only in injury to customers' good will but also in remedying the imperfections.

Several weeks prior to his discharge Barnett had been admonished upon his derelictions, but a week later similar neglect was chargeable to him. Reprimand followed. On the day of his release he approved as of first-rate quality some 600 to 800 yards of cloth subsequently rejected. Barnett acknowledged that he was to blame.

He was compensated on an output basis, with a pay incentive for increased production. His machine geared to handle 60 yards per minute, he deliberately ran it at the rate of 125 yards to expand his earnings. This he admitted afterwards in testimony before an employment security commission.

Vocally Barnett opposed a union, and we cannot understand why the examiner never attributed his discharge to incompetence.

In summary, the evidence does not support the findings of the examiner and the Board that there was interference, restraint and coercion by Lyman of its employees amounting to unfair labor practices. The only exception is Overseer Harris' pursuit of employee Ward. This was an unwarranted incident, but affect-

ing only one among 3,000 employees, we do not deem it sufficient to condemn Lyman as practicing unfair labor treatment. Likewise, on analysis the evidence does not uphold the examiner's findings that the six employees were discharged because of their union activities.

The order of the Board will not be enforced.

Enforcement of order denied.

J. SPENCER BELL, Circuit Judge (dissenting):

I disagree with my brethren. Indeed, the majority's statement of the facts discloses that there is more than "substantial evidence" to support the Board's findings. We should not usurp the Board's function of determining credibility.