**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**CONSOLIDATED DIESEL ELECTRIC COMPANY, DIVISION OF CONDEC CORPORATION, Respondent.**

**No. 72-1206.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1972.

Decided Nov. 14, 1972.

Russell Gardner, Atty., N.L.R.B. (Peter G. Nash, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, William Wachter and Kenneth Pearlman, Attys., N.L.R.B., on brief), for petitioner.

Jesse S. Hogg, Miami, Fla. (Robert L. Norton and Hogg & Allen, P. A., Miami, Fla., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order finding the respondent guilty of violations of

Section 8(a)(3) and (1) and Section 8 (a)(3), (4) and (1) of the National Labor Relations Act, as amended,[1] by (1) coercively interrogating and threatening its employees in connection with their union activities, (2) by discriminatorily discontinuing its second-shift and thereby laying off six employees, and (3) by discharging employees Charles Nail and Ricky Mullinax because of union activity. As a result of such findings, the Board ordered the respondent to cease and desist from discharging any employee "in order to discourage membership" in the union, from "[c]oercively interrogating any employee concerning his union membership or union activities" and from "[t]hreatening employees with reprisals" for union activity. It also ordered reinstatement, with back pay, of several members employed on the second-shift, which was discontinued by the respondent, as well as of Charles Nail and Ricky Mullinax.

We deny enforcement.

## I.

The respondent, against whom these violations were found by the Board, is a subsidiary or division of Condec Corporation, a conglomerate with a number of subsidiaries in various parts of the country. In early 1969, it opened a plant in Charlotte, North Carolina, to assemble missile cradles and a military vehicle named, oddly, GAMMA goat, the nature of which was not described in the record. During 1969, it began to build up its work force, looking to an eventual complement of some 300 to 500 employees. Immediately after the respondent commenced operations in its Charlotte plant, the union (The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW) undertook an active campaign to organize the workers in the plant. The campaign was from the outset singularly successful. A majority of the employees apparently signed union authorization cards and indicated their union affiliation by wearing union badges or stickers on the job.[2] This was clearly the situation when in early February, 1970, the respondent began a very limited second-shift operation designed to produce at the plant a part then in short supply. The shift consisted merely of a "leadman" and eight other employees. Five of these signed union authorization cards and wore at times union badges or stickers on the job.[3] After a bare three-weeks' period of operation this second-shift operation was discontinued and no second-shift operations have since been scheduled by the respondent. With the discontinuance of the second-shift, the employment of the workers on such shift, including both union and nonunion employees, was terminated on February 28, 1970. On March 11, 1970, Nail, a first-shift employee, and on April 3, 1970, Mullinax, also a first-shift employee, were discharged, both, according to the respondent, for cause. A month later, the union, though not yet certified as bargaining agent, filed charges with the Board, claiming that the termination of the employment of six employees (including Stillwell, whose union affiliation was not established) on the second-shift and the discharges of Nail and Mullinax resulted from union activities of such employees and were intended to discourage membership in the union. In the meantime, the union had filed a petition for an election and the Regional Director of the Board had on April 8, 1970 ordered such election. This election was held on May 7, 1970 (three days after the union filed its charges) and the union scored an overwhelming victory, receiving 163

---

1. 29 U.S.C. 151 et seq.

2. Mullinax, a witness for the general counsel and a complainant, testified that every employee was wearing a union sticker. This was an exaggeration but the vast majority undoubtedly were.

3. Only five of the nine employees on the second-shift testified to union affiliation. It was contended that a sixth, Stillwell, was a member but he did not testify nor is there any direct testimony that he affiliated with the union.

favorable votes as against 48 opposed. The General Counsel delayed any action on the union's discrimination charge until December 31, 1970, when he issued a formal complaint. Hearings were had in March, 1971 and the Trial Examiner's decision was issued on June 30, 1971. This report of the Trial Examiner was adopted and affirmed by the Board on October 26, 1971.[4] In the meantime, the union and the respondent had, without any difficulty, agreed upon a contract. It is this report, as affirmed by the Board, the enforcement of which is sought.

## II.

As a basic predicate for his ultimate findings of violations of the Act and as the underpinning for his other findings, the Trial Examiner tags the respondent with an anti-union animus. This is a critical finding in the case and one repeated as a substantial basis for the several separate ultimate findings thereafter made. To sustain such a finding he seizes upon a single statement volunteered by Powers, who, at the outset of operations in Charlotte, was personnel manager, that he had told the employees that the company "did not want a union in the plant and that it would do everything legally in its power to keep a union out of the plant." It is not without significance that no one of the witnesses for the Board testified even to having heard this statement, much less to having been deterred by it in expressing his union preference or in pursuing his union activities. As stated, too, the expression was developed during Powers' direct testimony. More important, it was not followed by any action on the employer's part to impede the union's activity. The record is bare of any evidence, except for the action of Miller to which we shall refer later, that the respondent made a single derogatory remark about the union, expressed any threat of reprisal on account of union affiliation (though the union affiliation of scores of its employees was freely proclaimed in the plant), engaged in any surveillance of union meetings or activities, interrogated any employee about union affiliation or objected to employees' wearing union badges and stickers on the job.[5] For all the record shows (except for Miller's activity) the respondent was completely passive during the organization drive, making no effort whatsoever to influence its employees either for or against the union. In that context, to take a statement representing what one Court has appropriately characterized as "the common general expression of desire not to have a union in the shop",[6] and a statement which was "unqualifiedly privileged under the provisions of section 8(c) of the Act",[7] and use it to stamp an employer with an anti-union animus, in the face of the record of passivity on this employer's part, is wholly unauthorized.[8]

4. Since the Board adopted *in toto* the Trial Examiner's report as its findings and conclusions, our references hereafter are to the Trial Examiner's report.

5. There was evidence that on one occasion an official of the respondent told some employees that they might not solicit signatures to union authorization cards on company time. Such a rule has been held valid in Hosiery Corporation of America v. N.L.R.B. (4th Cir. 1970) 422 F.2d 784, 785. The incident was not considered significant by the Trial Examiner, who did not cite it as evidence of anti-union animus.

6. N.L.R.B. v. General Stencils, Inc. (2d Cir. 1971) 438 F.2d 894, 899.

7. Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B. (4th Cir. 1964) 330 F.2d 579, 583, cert. denied 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88. To the same effect: J. P. Stevens & Co. v. N.L.R.B. (4th Cir. 1968) 406 F.2d 1017, 1021; N.L.R.B. v. Kayser-Roth Hosiery Co. (4th Cir. 1968) 388 F.2d 979, 980; N.L.R.B. v. Lyman Printing Co. (4th Cir. 1966) 356 F.2d 844, 846; N.L.R.B. v. Threads, Incorporated (4th Cir. 1962) 308 F.2d 1, 8-9.

8. This is especially so in view of the respondent's record at its other plants, all of which are organized and operating under collective bargaining agreements, and in view of the ease with which the union apparently secured representation and a union contract at this plant.

And this is particularly inappropriate when the finding is used as a primary basis for the other findings of illegal action.

Nor is this finding of anti-union animus bulwarked by the several statements attributed to the supervisor Miller, statements on which the Trial Examiner would rest a finding of coercive interrogations and threats of reprisal. The record indicates that there were about 50 supervisors in the respondent's work force of 300. Such employees were at the lowest level in the supervisory hierarchy. Yet, out of this entire group of supervisors, the Board has identified only one (i. e., Miller) who made at any time during the union's organizational drive a critical remark about unionization. It is fair to conclude that Miller's remarks were personal and were not prompted by the respondent. Certainly, the absence of any derogatory remarks by the other 49 supervisors should repel any notion that the respondent was engaged in any concerted effort to combat or discredit the union. And the very nature of Miller's expressions forcibly supports the conclusion that he was voicing, in an informal, casual way, his own personal views. Thus, in a friendly conversation with a few employees during a supper break, he referred to his employment on the West Coast, where there had been a strike and where, as a consequence, he had lost considerable time. For that reason, he said he did not favor a union. Others in the group expressed themselves as favoring the union. Miller did not press his viewpoint or take issue with this contrary expression from other employees. On another occasion, Miller inquired of an employee at his job whether he favored the union. The employee bluntly affirmed his affiliation with the union. This was the extent of the conversation.[9] It is impossible to discover anything coercive in this inquiry by Miller. It manifestly produced no fear of reprisal on the employee's part, otherwise, he would not have responded so straightforwardly.[10] It involved no request that the employee relinquish union membership.[11] It included not the faintest hint of reprisal.[12] It was a single, isolated, casual interrogation, occurring in the employee's work area, involving only one supervisor out of approximately 50.[13] It is the very type of statement which this Court

9. N.L.R.B. v. Dorn's Transportation Company (2d Cir. 1969) 405 F.2d 706, 713–714, sets forth the rule as to coercive interrogation thus:
"Since an employer has the right to interrogate employees with respect to union organization purely for informational purposes, NLRB v. Great Atlantic & Pacific Tea Co., 346 F.2d 936 (5 Cir. 1965), we have held that interrogation, not itself threatening, is not an unfair labor practice unless it meets certain fairly severe standards. Bourne v. NLRB [332 F.2d 47], supra. See footnote 3, supra. These include a background of employer discrimination and demonstration that the circumstances of interrogation would induce fear of reprisal."
The standards referred to in *Dorn* were spelt out in Bourne v. N.L.R.B. (2d Cir. 1964) 332 F.2d 47, 48. They provide an authoritative statement of the tests to be applied to an interrogation in passing on whether it will support a finding of impropriety under the Act.

10. Cf., J. J. Newberry Co. v. N.L.R.B. (2d Cir. 1971) 442 F.2d 897, 901:
"Likewise, employee Larson's straightforward reply hardly supports an inference of fear".
N.L.R.B. v. Milco, Inc. (2d Cir. 1968) 388 F.2d 133, 137:
"In evaluating questions arising from the interrogation of employees, the issue is whether the activity is 'calculated to frustrate the union's organization campaign by installing fear of reprisals in the employees.' "

11. See N.L.R.B. v. D'Armigene, Inc. (2d Cir. 1965), 353 F.2d 406, 411.

12. See Utrad Corporation v. N.L.R.B. (7th Cir 1972) 454 F.2d 520, 524.

13. Cf., N.L.R.B. v. Talbot-General Wire Products, Inc. (8th Cir. 1969) 419 F.2d 824, 825. Moreover, it was meaningless as an interrogation, since the employee to whom the inquiry was addressed was wearing a union badge, signifying that he did favor the union.

found harmless in N. L. R. B. v. Hinde & Dauch Paper Co. (4th Cir. 1948) 171 F.2d 240, 241, observing:

> "But mere isolated expressions of minor supervisory employees, which appear to be nothing more than the utterance of individual views, not authorized by the employer and not of such a character or made under such circumstances as to justify the conclusion that they are an expression of his policy, will not ordinarily justify a finding against him." [14]

Finally, it was testified that Miller approached an employee who was wearing a union badge, told him angrily to take it off, and, when the employee refused, petulantly remarked that the union wasn't "running this place." This, again, was an isolated incident and plainly did not accord with the respondent's policy. The respondent itself made no objection to employees wearing union badges on the job. Employees were wearing them all over the plant during the organizational campaign. One of the employees on the second-shift testified, "I seen people wearing them so much that I didn't pay attention to them." Admittedly, more than half of the employees were wearing badges on the job. Other than this one statement by Miller, no one in a supervisory position ever entered the slightest objection to the employees' wearing union badges on the job. And that Miller's attitude did not accord with the employer's policy is evidenced conclusively by the successful manner in which the employee repulsed Miller's demand.

These casual remarks of Miller clearly cannot support an order finding that the respondent "coercively interrogated employees or threatened them with reprisals should they engage in activities on behalf of a labor organization". Neither will they provide substantial evidence of an anti-union animus on the part of the respondent. These acts of Miller, to which the Trial Examiner devoted so much attention and on which he based much of his finding, can well be dismissed with the same comment used by the Court in National Labor Relations Board v. W. T. Grant Co. (4th Cir. 1953) 208 F.2d 710, 712, in dealing with similar evidence. The Court in that case characterized the evidence as "hardly worthy of mention". In measuring a record for substantial evidence under the Act, it is error to assume that "our inquiry should go no further than to ascertain whether there is evidence in the record which, in and of itself, tends to support the Board's conclusion. Rather we are obliged to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." N. L. R. B. v. A. S. Abell Company (4th Cir. 1964) 327 F.2d 1, 5. In short, "the test is whether 'the inferences on which the Board's findings were based were so overborne by evidence calling for contrary inferences that the findings of the Board could not * * * be deemed to be supported by "substantial" evidence'." Black Hawk Corporation v. N. L. R. B. (4th Cir. 1970) 431 F.2d 900, 902, cert. den. 401 U.S. 911, 91 S.Ct. 876, 27 L.Ed.2d 810. When, in line with these established rules, the findings of the Board that the respondent had an anti-union animus and had engaged in improper interrogations and threats of reprisal are scrutinized in the light of the entire record, it is clear they are not supported by substantial evidence.

14. See, also, Firestone Synthetic Fibers Company v. N.L.R.B. (4th Cir. 1967) 374 F.2d 211, 215:

"'Isolated statements by minor supervisory employees made casually in conversations with fellow employees without the knowledge of their employer and not in the course of their duty or in the exercise of their delegated authority over those employees ought not to be [too] quickly imputed to their employer as its breach of the law.'"

To the same effect is Martel Mills Corp. v. National Labor Relations Board (4th Cir. 1940) 114 F.2d 624, 633–634.

### III.

 We are equally convinced that the findings of the Board that the discontinuance of a partial second-shift was motivated by a purpose to discourage union activity and to impede the union in its organizational activity are without substantial evidence in the record. At the outset it should be pointed out that the respondent did not attempt to establish a true second-shift, duplicating fully the operations conducted on the first-shift. In establishing its so-called second-shift, the respondent was merely endeavoring to produce in its own plant certain minor parts which it had previously been securing from another subsidiary of its parent company. This other subsidiary had been shut down by a strike and, according to the company, was expected to be delayed in resuming operations. The limited nature of the second-shift is indicated by the size of its work-force as compared with that of the regular first-shift. The proposed second-shift contemplated only 8 or 9 employees as against approximately 300 employed on the first-shift. And the testimony of the Board's witnesses supports the contentions of the employer that the latter experienced difficulty in getting this small second-shift into operation. Accordingly, when employed, the second-shift employees were told, according to their own testimony, that the beginning of the shift was being delayed until the respondent could secure a qualified supervisor. But when the shift did begin, the respondent had been unable to secure for the shift a qualified supervisor; and it was its very inability to secure a qualified supervisor that was later given by the respondent as one of the reasons for discontinuing the shift. Actually, this second-shift, it seems, was never fully organized. Its personnel, other than its "leadman", were all trainees. The respondent testified the shift from the outset failed to operate efficiently; and this was most important, since all employees on the second-shift were paid premium rates. The shift was discontinued after only three weeks' operations. The reason given by the respondent was stated by its plant manager thus:

"When we started the second shift, we had hoped to get a competent supervisor for that shift. This didn't come about, and Schenectady picked up much faster after the strike than we had anticipated. So the need for a second shift was diminishing, and we couldn't get competent supervision for that shift; so coupled with the fact that there was a 10 percent shift premium, it was decided to terminate the second shift at the end of February."

The respondent's witnesses emphasized also the poor production record of the second-shift.

The Board, however, found that this discontinuance was to discourage the union's organizational effort and, to quote the Board's brief in this Court, to rid "itself of what it considered a hotbed of union activity". In support of this finding, it stated that six of the nine original employees on the second-shift "joined the union shortly after their employment, that most of them engaged in activities on behalf of the Union, and that these activities became known to supervisors and agents of the company." It observed that the determination to discontinue followed a Labor Board representation hearing at which one of the second-shift union members had been present.

The contention of the respondent that it discontinued the second-shift operation because it became unnecessary and, in addition, was an inefficient operation is supported by the failure of the respondent thereafter ever to attempt a second-shift operation, a fact the Board neglects to consider. The claim of the respondent that inability to secure a supervisor for the second-shift influenced the decision to discontinue the shift is given persuasive credence by the testimony of one of the complaining second-shift employees himself that, when hired, he was told that the beginning of the second-shift was being delayed until

"they had a supervisor for the second shift". This suggests that the commencement of operations of the second-shift depended to a large extent on securing an adequate supervisor and gives force to the respondent's later claim that its inability to secure such a supervisor partially accounted for the second-shift's subsequent discontinuance. Again, the Board would disregard this fact. Moreover, the premium pay required on the second-shift would be a powerful reason for discontinuing the shift if it were inefficient. The Trial Examiner would dismiss any testimony of poor production because it was not supported by specific records of production. The witnesses for the respondent, however, testified without objection to such poor production. Their testimony on this point was not challenged either by cross-examination or by refuting testimony.[15] In fact, it would seem that counsel for the Board accepted the accuracy of such testimony and attempted, in his cross-examination, to justify it because the employees on the second-shift "were trainees".[16] The Trial Examiner, also, makes light of this testimony because as he states it, "the second shift employees were, at the time of the layoff, still working a substantial number of overtime hours". The time records, admitted without objection into evidence, show conclusively that in the last week of the second-shift operation, not one of the complainants worked one hour of overtime.[17] Apart from all this, however, even the circumstances suggested by the Board do not support the finding made. The decision to discontinue the second-shift did not follow, as the Board suggests, any discovery by the respondent of a number of second-shift employees in attendance at the representation hearing.[18] Actually, the record shows that the respondent, in testimony given at that very hearing, stated that the decision to discontinue the second-shift had already been made. There was thus no connection whatsoever between the second-shift employees' presence at the representation hearing and the decision by the respondent to discontinue the second-shift. Further, the characterization of the second-shift as "a hotbed of union activity" is not borne out by the record. It is true that five of the eight or nine employees on the second-shift had signed union authorization cards and that four of them had worn union badges in the plant. As we have seen, there was nothing significant or unusual about this, however. No one of the second-shift employees was on the union's organization committee. No one of them testified to any unusual union activity on his part. McClure, one of these second-shift employees, described his union activity as "No more than wearing my badge"—which, incidentally was what scores of other employees were doing. Another wore a union badge for "three or four hours" and gave to the union organizer a list of those employees on the second-shift who had signed union cards. There was no intimation in the record that this latter action was known

15. Cf., Winchester Spinning Corp. v. N. L. R. B. (4th Cir. 1968) 402 F.2d 299, 306. In that case, the employer offered evidence of inefficiency, as the employer did in this case. The General Counsel made no effort to contradict such testimony. It was held that the testimony of the employer could not be disregarded by the Board. That, however, was what the Board did in this case by approving the Trial Examiner's finding.

16. Thus, in the cross-examination of the Charlotte plant manager, the Board asked:

"Q. Would this (i. e., poor production on second shift) also be because the men on the second shift were primarily new men still in training?
"A. Yes."

17. Etier, Carver, Redfern and Stillwell worked 40 hours in the final week. Hagler worked only 32 hours and McClure 39.8 hours.

18. It is of interest that the complainant Mullinax testified he attended the Board's representation hearing in February. He identified a few employees he said were present at the hearing. No employee on the second-shift was so identified by him.

to the respondent, even if it could have been of any interest to the respondent in view of the openness with which employees demonstrated in the plant their union affiliation. Two others on this shift testified that they had given out one or two authorization cards. Again, there was nothing unusual about this. This record indicates this was being done by numerous employees without any objection from the respondent. That the respondent would have discontinued a second-shift, which admittedly was not adequately supervised and represented both problems of management and of efficiency and the necessity for which obviously had been relieved, for the subtle purpose of ridding it of five union members out of an employment complement of some 300, a majority of whom were openly proclaimed union members is wholly illogical and incredible.[19] We are of opinion that there is not substantial evidence, taking into account the whole record, to support the Board's finding that the "discontinuance of the second shift on February 28 was because of the employees' union activities", and that an order requiring the reinstatement of the employees on such second-shift, with back-pay, cannot be enforced.

## IV.

The Board affirmed the finding of the Trial Examiner that the employee Nail was discharged to discourage membership in the union, and that such discharge was in violation of Section 8(a)(3), (4) and (1) of the Act. A discharge, whether the cause be good or bad and whether it be deemed harsh or lenient discipline, offends the Act *only* if discriminatorily motivated on account of union activity or, to state it another way, there must be an unlawful intent in the discharge. N. L. R. B. v. Brown (1965) 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839.[20] And the burden of establishing such discriminatory motive or unlawful intent, it is settled, falls on the General Counsel. When a cause other than union activity exists for the discharge, illegal motive cannot be based merely on the discharged employee's union organizational activity; and by offering only such proof, the General Counsel does not sustain his burden.[21]

---

19. See N. L. R. B. v. Materials Transportation Company (5th Cir. 1969) 412 F.2d 1074, 1078–1079:

"Over eighty percent of the Company's employees were union adherents. Where such a great percentage of employees attend union meetings and are union adherents, Company knowledge of the identity of the union adherents loses much of its significance without a showing that the employees not in favor of the union were more logical candidates for layoffs, * * *."

20. N. L. R. B. v. Grand Foundries, Inc. (8th Cir. 1966) 362 F.2d 702, 710–711.

21. " * * * 'where "a man has given his employer just cause for his discharge, the Board cannot save him by showing that he was pro-union and his employer anti-union." ' " Nix v. N. L. R. B. (5th Cir. 1969) 418 F.2d 1001, 1008. To the same effect: Poindexter v. N. L. R. B. (4th Cir. 1965) 353 F.2d 524, 526, cert. den. 385 U.S. 857, 87 S.Ct. 106, 17 L.Ed.2d 84.

See, also, N. L. R. B. v. Ogle Protection Service, Inc. (6th Cir. 1967) 375 F.2d 497, 505–506, cert. den. 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108:

"An employer has the right to discharge an employee for any reason, whether it is just or not, and whether it is reasonable or not, as long as the discharge is not in retaliation for union activities or support. (Citing cases) The Board cannot substitute its judgment for that of the employer as to what constitutes reasonable grounds for discharge. (Citing cases) The question of proper discipline of an employee is a matter left to the discretion of the employer. (Citin cases)

"Membership in a union does not immunize employees against discharge for reasons other than union hostility. (Citing cases) An employer's stated or avowed opposition to a labor union is not, in itself, sufficient evidence to sustain a finding that his employees were discharged because of discrimination against the union. (Citing cases)
* * * * *
" * * * The Board is limited to determining whether there was a discriminatory motive behind an em-

In N. L. R. B. v. United Brass Works, Inc. (4th Cir. 1961) 287 F.2d 689, 693, this Court stated this principle thus:

> "If discrimination may be inferred from mere participation in union organization and activity followed by a discharge, that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership."

Again, in H. L. Meyer Company v. N. L. R. B. (8th Cir. 1970) 426 F.2d 1090, 1094, it was pointed out:

> "Where the reasons advanced for discharge are persuasive and serve as a plausible motive, the mere existence of the employee's union activity cannot serve as the real motive behind the employer's action."

In essence, as the Court put it in Lozano Enterprises v. N. L. R. B. (9th Cir. 1966) 357 F.2d 500, 503, " 'In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one.' " [22] It has often been stated that insubordination and refusal to obey instructions constitute reasonable grounds for disciplining an employee, and discharge for insubordination or refusal to obey instructions is perfectly lawful. Visador Co. v. N. L. R. B. (4th Cir. 1967) 386 F. 2d 276, 281; N. L. R. B. v. Wix Corporation (4th Cir. 1962) 309 F.2d 826, 833; N. L. R. B. v. Camco, Incorporated (5th Cir. 1966) 369 F.2d 125, 129; Nix v. N. L. R. B. (5th Cir. 1969) 418 F.2d 1001, 1009.[23]

With this background of the applicable law, it remains to examine the circumstances of Nail's discharge. The respondent allegedly discharged Nail for insubordination and refusal to obey instruction. The incident giving rise to this alleged insubordination occurred when Wright, Nail's supervisor, approached Nail, as he was working at a drill press, and, after criticizing him for failure to wear his safety glasses, said, according to Nail, "Don't you know I can fire you for not wearing your safety glasses"? Nail's testimony is that he merely replied, "I had my safety glasses on when the drill was on". The supervisor's testimony is quite different. According to his version, Nail, instead of allegedly being meek when reprimanded for failure to observe the alleged rule about wearing safety glasses became defiant, cursed and acted in an insubordinate manner. All of this occurred in the plant in the presence of other employees. When instructed to accompany the supervisor to the personnel office rather than to continue the controversy on the job, Nail refused.[24] Rather than carrying the controversy further at that time, the supervisor left, attempted to consult his supervisor on the proper course to be followed, returned and told Nail to "hit the clock" and report to the personnel office the next morning. The next morning Nail reported to the personnel office and was discharged because, as he was advised, of his "insubordination" and failure to follow instructions.

---

ployee's discharge, and not whether the Board agrees with the employer's reasons or even finds them reasonable."

**22.** See, also, Maphis Chapman Corporation v. N.L.R.B. (4th Cir. 1966) 368 F.2d 298, 304:

> "In cases where the record reveals a legitimate and nondiscriminatory reason for the layoff of an employee, mere circumstantial evidence of discriminatory intent is often outweighed or diminished to the point that it cannot reasonably be deemed 'substantial' in the Universal Camera Corp. [v. N.L.R.B.,

340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456] sense."

**23.** Cf. Judge Dobie in Martel Mills Corp. v. N.L.R.B., supra, 114 F.2d 624, at p. 633:

> "The employer must be permitted to discharge the inefficient, the irresponsible, the disobedient, the immoral."

**24.** Cf., Boaz Spinning Company v. N.L. R.B. (5th Cir. 1968) 395 F.2d 512, 516, in which it was held that an employee's defiance of the instructions of a supervisor in plain view of other employees placed the supervisor in an untenable position and justified disciplinary action.

The Trial Examiner is ambivalent in his treatment of the incident which precipitated Nail's discharge. He found that the rule about wearing safety glasses at work was not enforced, thus indicating that there was no real basis for the supervisor's reprimand of Nail, which represented the beginning of the controversy between the supervisor and Nail. Having thus dismissed as unimportant the rule prompting the opening reprimand, the Trial Examiner proceeds to accept neither Nail's nor the supervisor's version of the ensuing controversy between the supervisor and Nail as a result of the reprimand. He did feel that the verbal exchange between them was more spirited and serious than Nail put it but not as "violent" and offensive as the supervisor described it in his testimony. At one point in his report, he indicated that Nail's conduct at the time may have been "a momentary outburst perhaps caused by a conflict of personalities", warranting perhaps suspension but not discharge. Specifically, though, he refused to make a finding on what actually occurred between the supervisor and Nail, on whether at the time Nail was insubordinate or had cursed and refused to obey instructions. In fact, he seems to accept that "a portion of the reason" for Nail's discharge was Nail's insubordination and the natural "desire" of management to sustain the prerogative of its supervisor.[25] Despite this finding that the employer may have had a non-discriminatory reason for terminating Nail's services and that there was a just cause for his suspension, if not discharge, the Trial Examiner finds the discharge illegal because "a substantial motivating reason" for the discharge was "a purpose to interfere with union organizational activities."

The Trial Examiner made a number of cumulative and interdependent findings upon which he built this ultimate finding of discriminatory motive in the discharge. Unless such subsidiary findings have substantial support in the record, there is no basis for the ultimate finding of discriminatory motive. It is accordingly important to examine such subsidiary findings and to determine whether they rest on substantial evidence. These subsidiary findings were (1) that there was "nothing in the record to detract from the conclusion that Nail had been an exemplary employee", (2) that Nail was "very active on behalf of the Union, being perhaps its most ardent supporter in the plant", (3) that "the Respondent opposed the unionization of its employees", (4) that the rule respecting the wearing of safety glasses "was honored more in the breach than in enforcement", and finally (5) that the claimed violation of the rule would not have arisen and there would have been no basis for discharge had Nail not been so active in the union.

We do not think the record, viewed in its entirety, provides substantial evidence to support the subsidiary reasons on which in turn the ultimate findings of discriminatory motive rests. It is somewhat unorthodox to conclude, as the Trial Examiner does at the outset that an employee is "an exemplary employee" merely for the reason there is no evidence "to detract from that conclusion". That one is retained in employment may justify the inference that he is a satisfactory employee but it plainly does not warrant a finding that he is an "exemplary" employee. The record is barren of any testimony to show whether Nail was an outstanding employee or not; he was simply an employee. The circumstance that Nail was "active in the union", as also found by the Trial Examiner, is undisputed, but so were scores of other employees—employees who, so far as this record shows, had no difficulty with either the supervisor or the respondent. There was nothing so unique about Nail's active union membership that it was likely to make Nail, any more than a couple of hundred other employees, a target of anti-union bias.[26]

25. See, Boaz Spinning Company v. N.L. R.B., *supra* (395 F.2d 512, p. 516).

26. N.L.R.B. v. Materials Transportation Company, *supra*, (412 F.2d 1074, pp. 1078–1079).

It should not be overlooked, too, that the respondent had known for many months of Nail's union activity. There was no concealment of his activities. If the respondent had intended to discharge him because of his union affiliation, it surely had many opportunities over the months prior to his discharge to have developed a pretext or excuse, if pretext it sought, for terminating his services. Its failure to do so can only be taken as another indication of the respondent's indifference to the union activities of its employees. There were, as we have already observed, over 50 employees, along with Nail, on the union organizing committee; no other member of that group suffered any disciplinary action. There were scores wearing union badges in the plant; such conduct did not provoke employer retaliation. The Trial Examiner would, however, invest Nail with a higher status than one "active in the union"; he was, so the finding goes, "perhaps its most ardent supporter in the plant." He was, we have seen, on the organizing committee; he did secure signatures on authorization cards. Over a period of more than a year he had attended six union meetings. But did this make him the "most ardent" union member in this plant? There were numerous others that could fit this description as well as Nail. Equally invalid is the finding of anti-union animus on the part of the respondent, a constant theme in all the adverse findings of the Trial Examiner. We have already examined [27] the basis for this conclusion and found it without a substantial basis in the record; we shall not repeat our reasons for this conclusion. Finally, the findings that the requirement of safety glasses was a mere pretext and, to such extent as it existed, was more honored in the "breach than in enforcement" are " 'so overborne by evidence calling for contrary inferences that the finding(s) * * * could not * * * be deemed to be supported by 'substantial' evidence'." [28] The requirement was not a pretense; it was both real and necessary. So much Nail admitted, though he contended the use of safety glasses was not necessary when the drill press was off. The Trial Examiner refers to the testimony of the complainant Redfern in support of his finding. This witness did testify that he had never worn safety glasses at work, that the respondent had never issued him safety glasses and that he had never been reprimanded for failing to wear such glasses. It was this specific testimony on which the Trial Examiner planted his finding that the safety glasses rule was not observed. Yet this testimony, which the Trial Examiner thus accepted, was contradicted by all the witnesses called by the respondent and, more significantly, by Nail himself. Nail testified categorically that on his job he was required to wear safety glasses. He only qualified this with the claim that they could be removed if the drill press was not operating. He actually assigned a reason for the requirement, explaining that, "It would be a hazard to the eyes if you didn't have safety glasses on." Moreover, the respondent, according to Nail's testimony again, furnished its employees safety glasses as a part of their equipment. It would be incredible that the respondent would have gone to the expense and trouble of issuing to its employees such glasses if the requirement of safety glasses were an abandoned or unnecessary rule. And the importance of the requirement is well illustrated by the fact that Redfern, who had testified that he had not worn safety glasses, sustained an injury to his eyes, according to his own testimony. Moreover, the respondent offered in evidence a notice, which it claimed was on the employees' bulletin board, that all employees, as well as all visitors, "must wear safety glasses at all times". There was no denial that such notice was so placed, though Nail testified that he had not seen it. In sum, it must be concluded that the record is overwhelming that the require-

---

27. *Supra*, Part II.

28. Black Hawk Corporation v. N.L.R.B., *supra* (431 F.2d 900, p. 902.)

ment that safety glasses be worn, particularly when the drill press was being operated, was a salutary rule, of which Nail was fully cognizant, and which he claims to have observed. It was not an abandoned or disregarded requirement. It is manifest, then, that the several findings on which the Trial Examiner predicates his ultimate finding of discriminatory motive do not have substantial support in the record.

■ Since the subsidiary findings on which the Trial Examiner rested his ultimate finding of discriminatory motive are unsupportable, it follows that the ultimate finding itself must fail. And this conclusion is amply supported by other circumstances in the case. The record, for instance, plainly shows that there was reasonable ground for disciplinary action against Nail. So much even the Trial Examiner seems to concede. He recognizes that Nail may have been insubordinate (he characterizes it as perhaps "malfeasance"); he further recognizes that, in its action, the respondent may have been motivated by a feeling that it must support a supervisor's authority. The Trial Examiner does not thus dispute that the respondent may well have had a lawful motive in the discharge. But to overthrow that lawful justification, the report of the Trial Examiner has only an inference based upon "mere participation in union organizational activity", an inference that cannot be justified under the circumstances of this case. N. L. R. B. v. United Brass Works, Inc., *supra* (287 F.2d 689, p. 693). There was no proof of any pattern of union hostility or anti-union activity on the part of the respondent. The only basis for a finding of

anti-union bias is to be found in a privileged statement of the respondent's personnel director. The respondent engaged in none of the activities that normally support a finding of anti-union animus and conduct. Unlike the situation in the two cases cited by the Trial Examiner,[29] there was, as has already been observed, no extensive covert surveillance of union activity, no threatening interrogation of employees, no threat that the plant could be closed or prophesy of other dire results of a union success. The record, taken as a whole, does not "present a substantial basis of believable evidence" pointing towards "a discriminatory motive" in Nail's discharge.

V.

The Trial Examiner also found that the termination of Mullinax's employment on April 3, 1970 was discriminatorily motivated. In reaching this conclusion, the Trial Examiner began with a finding of anti-union animus on the part of the respondent, which, in his opinion, infected the subsequent action of the respondent in firing Mullinax. He then proceeded, as he did in the Nail case, to find that Mullinax "was one of the more militant union activists in the plant", though there was no substantial evidence to support such statement.[30] Mullinax, shortly after he began working at the plant, did sign up with the union and thereafter wore continuously a union button on the job. By his testimony, however, this was not unusual or an expression of union militancy; most of the other employees were doing the same.[31] He claims to have signed up union members but again this was being done by most of the employees.[32] It is

---

29. N.L.R.B. v. McCormick Concrete Company of S. C., Inc. (4th Cir. 1967) 371 F.2d 149 and N.L.R.B. v. Greensboro Hosiery Mills, Inc. (4th Cir. 1968) 398 F.2d 414.

30. The nearest to any such statement is found in the testimony of the respondent's personnel manager. He testified that Mullinax was "a strong advocate of the union" but immediately added, "as (were) many others in the plant." Mul-

linax, thus, was not unique in his support of the union and there would have been no reason on that account to single him out from among the many other "strong advocate(s) of the union."

31. Cf., N.L.R.B. v. Materials Transportation Company, *supra*, (412 F.2d 1074 pp. 1078–1079).

32. It is somewhat significant that both Nail and Mullinax claimed to have signed

significant, on the other hand, that even the names of the employee who, when the union won the election, became its president, and of the union committee members in the plant, were unknown to Mullinax. Again, though he claims to have been on the union's organizing committee of from "50 to 100", he could only name two members of such committee and those two were himself and his fellow complainant Nail. It is incredible that one as active in the union affairs as the Trial Examiner found Mullinax to be would not have been acquainted with the other members of the organizing committee, at least more than his fellow complainant Nail, and would have been able to name those union leaders who were so prominent in the campaign that they were later selected as the union officers by the union employees. Moreover, whether a "militant" union adherent or not, Mullinax by any standard was not a satisfactory employee. As the Trial Examiner put it obliquely, Mullinax "was not an exemplary employee". Over the four and a half months he was employed his repeated derelictions had been treated with great tolerance and forbearance by the respondent. He had absented himself without authorization and without notifying his employer.[33] He was repeatedly tardy.[34] He was constantly wandering off the job.[35] If the respondent had been seeking pretexts to fire Mullinax, it had many opportunities under the undisputed record.[36] And all during this time, it knew of Mullinax's union activities. Mullinax testified that, beginning in December, 1969, he had continuously worn his union badge in the plant. There was no concealment of his union activities. If, because of his union activities the respondent wanted to fire Mullinax, why did not the respondent do so when on at least two occasions in February he failed without notice to report for work for three days, drawing reprimands in both cases? Mullinax admitted that he had often reported late for work. He had carelessly damaged a company fork lift. All of these derelictions were passed over with reprimands. Finally, on the day he was fired, he left his work and disappeared (he says for over an hour; according to the respondent's witnesses, for most of the morning). As a matter of fact, he had done no company work all morning. By his own testimony, contrary to instructions, he had initially been working on some hammer handles belonging to him personally. Some time during the morning, without any authorization, he went, so he claimed, to the salvage yard to get some material. Whether he went there, or, as the personnel director testified Mullinax told him, he merely "goofed off" during the morning, he was, by his own testimony, absent for a substantial period from his work station without any authorization. He claimed he had no work to perform. This is incredible and is contradicted by the testimony of his foreman. This, it seems, was not his first act of "goofing off" or absenting himself from his work sta-

---

up 100 employees on union authorization cards. Two of the employees whose services were terminated with the discontinuance of the second-shift claimed to have secured signatures on authorization cards. There were from 50 to 100 members of the union organizing committee engaged in the same activity. Remembering that there were only 168 votes for the union and at most there were fewer than 300 employees, it seems that the claims of Nail and Mullinax in this regard are obvious exaggerations.

33. See N.L.R.B. v. Greensboro Hosiery Mills, Inc., *supra* (398 F.2d 414, pp. 416–417.)

34. See DC International, Inc. v. N.L.R.B. (8th Cir. 1967) 385 F.2d 215, 220–221.

35. See N.L.R.B. v. Wix Corp., *supra* (309 F.2d 276, pp. 829–830.)

36. See Martel Mills v. N.L.R.B., *supra* (114 F.2d 624, pp. 631–632), quoted with approval in N.L.R.B. v. United Brass Works, Inc. *supra* (287 F.2d 689, p. 693) :
"* * * Had the Martel Mills desired to discharge Whittle for his union affiliations, it could very easily have selected one of the occasions when Whittle had violated the company rules * * *."

tion. As his supervisor testified, "he was a difficult man to keep up with".

In sum, Mullinax was an unsatisfactory employee, with whom the employer had been indulgent in the extreme. And it had shown this indulgence, even though it had known all along of Mullinax's union affiliation. Such a record will not support a finding that his discharge was motivated by Mullinax's union activity.

Enforcement denied.