541 F.2d 277
 93 L.R.R.M. (BNA) 2297, 79 Lab.Cas. P 11,615
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
National Labor Relations Board, Petitioner
v.
Edward M. Rude Carrier Corporation, Respondent.
 No. 75-1380.
 United States Court of Appeals, Fourth Circuit.
 Sept. 16, 1976.
 
 Before BOREMAN and BRYAN, Senior Judges, and BUTZNER, Circuit Judge.
 
 
 1
 BRYAN, S.C.J.
 
 
 2
 The National Labor Relations Board petitions for enforcement of its order in the main directing Edward M. Rude Carrier Corporation, Clarksburg, West Virginia:[1]
 
 
 3
 1. To cease the discontinuance of the hauling of sugar or floor covering that was settled upon "without affording the Union[2] an opportunity to do so or the effects thereof" and to resume that pursuit;
 
 
 4
 2. To offer ex-employee Grant Bennett reinstatement, with reimbursement of his loss of pay since his discharge, to the position (truck driver) that he occupied at the time of discontinuance of the hauling of sugar and floor covering; and
 
 
 5
 3. To desist from bargaining directly with employee Clarence Hamilton, another driver on the discontinued hauls.[3]
 
 
 6
 There is little ground for differences between the parties on the facts. The company-employer has been a contract carrier under the authority of the Interstate Commerce Commission for at least 20 years, transporting by truck dynamite and blasting materials out of the E.I. Dupont de Nemours and Co. plant at Falling Waters, West Virginia, where the company maintains its principal terminal. The destinations are located in a large number of eastern States and the District of Columbia. About ten years ago the company procured ICC authority to serve as a common carrier of glass and glass products from Clarksburg and other places in West Virginia into nearby States; it was also authorized to carry glass products, groceries and floor coverings from specified points in Pennsylvania, Maryland and Ohio to the Clarksburg area.
 
 
 7
 Apparently the common carrier enterprise produced the lesser part of the company's operations, and the rates therefor were significantly lower than those for explosives. However, this division of the business permitted compensation for return hauls, and so led to the maintenance of a terminal at Bridgeport near Clarksburg but almost 200 miles from Falling Waters.
 
 
 8
 There were some 20 over-the-road truck drivers engaged in the contract carrier transportation. On the other hand, the common carrier branch of business required no more than three drivers, who were known as city drivers. The major portion of the latters' work consisted of hauling sugar and linoleum to consignees in the Bridgeport area; they drove under the common carrier permit only. This allocation of their work required a disproportionate number of the city drivers' hours, because it frequently meant "split deliveries", a distribution of a truck trailer's load to more than one consignee. Carriage of glass, however, from the Pittsburgh Plate Glass Company or bottles from Owens-Illinois plant, both in the locale of Clarksburg-Bridgeport, embraced but one-stop in on or off-loading. As a consequence, in 1971 the company gave up the hauling of groceries and sugar from Cincinnati and forewent other sugar deliveries. For more than a year the company pondered surrender of sugar and linoleum carriage entirely. Another factor inducing that possibility was the annoyance of loss and damage claims pressed by sugar consignors. Furthermore, a driver's time was wasted by waits during calls for cargoes by a shipper's need to inquire of the purchaser's credit.
 
 
 9
 With these concerns in mind and with word of the distribution of a new explosive by Dupont with alluring hauling prospects, the company on July 23, 1973 notified the sugar brokers that it would no longer take on their consignments. A like decision was made about linoleum. Because of this curtailment, the company on July 25 discharged Grant Bennett, a city driver. This left one city driver, the company explaining that Bennett was released, rather than the other, Clarence Hamilton, because of the latter's seniority. Bennett was told that his termination was due to the closing of the sugar and linoleum business.
 
 
 10
 There was considerable delay after the certification of the Union on July 17, 1973, until the meeting of the Union Secretary with the company officers. The latter ascribed the postponement to their thought that they must await further Board action since, on August 23, 1973, the Union had filed unfair labor practice charges with the Board for the company's failure to bargain with the Union about the discontinuance of the sugar and linoleum routes. They stated they had in mind a question of whether the Board could take jurisdiction, inasmuch as the employment after Bennett's separation comprised only a one-man unit which is not within the province of Union representation. Cf. Crispo Cake Cone Co., Inc., 201 NLRB 309 (1972); Westinghouse Electric Corporation, 179 NLRB 289 (1969).
 
 
 11
 During March 1974 the Board amended its petition by alleging additionally that the company had bargained with Clarence Hamilton, the remaining city driver, immediately instead of through the Union. The contention was that Hamilton was thereby tendered special and extra favors with a view of persuading him to reject the Union membership, and in this manner remove its representation completely.
 
 I.
 
 12
 the predominating thesis of the Board, wholly adopting the findings and conclusions of the Administrative Law Judge, is that the surrender of the sugar-linoleum operation, together with the related Bennett discharge, was unlawful because each was accomplished unilaterally, that is, without consultation of the Union before or after these events. The Board saw them as refusals to bargain under Secs. 8(a)(3) and (5) of the NLRA. Additionally, it says these steps were simply company tactics to unseat the Union and thus avoid all obligation of bargaining.
 
 
 13
 Contra, the company urges that it was free to decide upon the abolition of the sugar-linoleum activity without negotiating with the Union because the company was not anti-union inspired. Besides, substantial support for the Board's conclusion is wanting in the evidence. If this position prevails, it would also defeat the accusation as to the discharge of city driver Bennett, for it is of a piece with the company's withdrawal from the sugar-linoleum engagements. Our discussion of the first incident will, therefore, be intended to embrace the latter as well.
 
 
 14
 It is generally recognized that Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 491 (1951) has placed in our "keeping" the determination of "substantiality" in Board decisions, imperatively enjoining in this trust an understanding, besides a close, look at the evidence. That commandment is to be constantly borne in mind, particularly when pursuing the guideline later laid down by the Court in Textile Workers Union of America v. Darlington Manufacturing Co., et al., 380 U.S. 262, 275 (1965), with respect to the point at issue here--the purpose and effect of the instant closing:
 
 
 15
 ... a partial closing is an unfair labor practice under Sec. 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.
 
 
 16
 Our assay of the proof is that with one exception there is not "on the record as a whole ... substantial evidence to support" the findings of the Board that the company violated the NLRA. The exception is the company's discussing directly with driver Clarence Hamilton enhancement of his compensation rather than through the Union, the Board having settled the conflict of testimony thereon adversely to the company. In all of these determinations the court has assumed the correctness of the Board's conviction that the separation of Bennett from employment did not end the Union's representation by reducing it to a one-employee unit.
 
 
 17
 To begin with, contrary to the Board's finding, the closing of the company's sugar-linoleum division was not "motivated by a purpose to chill unionism". This is conclusively demonstrated not only expressly but by reasonable and fair inferences from attendant circumstances. No history of previous anti-union animus or any present indication has been shown.
 
 
 18
 The company's representative testified without contradiction that for almost two years before finally writing off this portion of its organization, the employer had considered the total cancellation of it because dissatisfied with the profits, a fait accompli in part through refusing in 1971 the handling of groceries. While no strict accounting or audit seems to have been adduced to corroborate this apprehension, the discard of this undertaking alone clearly attests the fact. That the company would prune this substantial limb from its overall enterprise for any reason other than financial is inconceivable. We cannot believe that it would lop off this branch embodying ten years of time, effort and expenditures, merely to retaliate against a unionism that affected only two drivers. Incomprehensible, too, is the imputation that this sacrifice was made by the company solely to drop one of them, so as to devitalize the Union as their representative. Yet this is precisely the Board's resolution.
 
 
 19
 Confirmation positive of the company's bona fides appears in its explanation for removing the sugar-linoleum equipment from Bridgeport to the Dupont plant. A haul of explosives more lucrative than the common carrier's compensation was already at Falling Waters, and also the prospect of a much expanded transportation need appeared there. Teeming with proof in the company's attribution of reasons for the closure are its endeavors to sell the common carrier certificate. A price of $20,000 was ultimately fixed and the disposition put in the broker's hands but no purchaser was found.
 
 
 20
 An appropriate summary of the guide to decision at this stage of the case was written for this court by Judge Russell in NLRB v. Consolidated Diesel Elec. Co., Division of Condec. Corp., 469 F.2d 1016, 1021 (4 Cir.1972):
 
 
 21
 In measuring a record for substantial evidence under the Act, it is error to assume that "our inquiry should go no further than to ascertain whether there is evidence in the record which, in or of itself, tends to support the Board's conclusion. Rather we are obliged to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." NLRB v. A.S. Abel Company (4th Cir.1964) 327 F.2d 1, 5. In short, "the test is whether 'the inferences on which the Board's findings were based were so overborne by evidence calling for contrary inferences that the findings of the Board could not * * * be deemed to be supported by 'substantial' evidence'." (Other citations omitted.)
 
 II.
 
 22
 By its final order the Board directed the company to resume the hauling of sugar and floor covering materials. Since we hold the company has not abrogated its bargaining obligations, no discussion of this direction would be more than obiter and it is declined. Likewise there is no occasion to descant upon the petition to the Board to reconsider this requirement because the company could no longer comply with it. The Bridgeport terminal had been abandoned and the company had also surrendered its ICC authority for carrying these commodities. This action was taken by the company because the Pittsburgh Plate Glass plant at Clarksburg had shut its doors, and thus cut off a main source of haulings by the company.
 
 Conclusions
 
 23
 The result is that this court will not enforce the orders of the Board except the one directing the company to cease negotiations with Hamilton.
 
 
 24
 Enforcement denied in part and granted in part.
 
 
 
 [1]
 Order of December 27, 1974; Case No. 6-CA-6925
 
 
 [2]
 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Teamsters Local Union No. 789
 
 
 [3]
 The order charged the conduct of the company to be in violation of Secs. 8(a)(3) and (5) National Labor Relations Act, 29 U.S.C. 158(a)(3) and (5) forbidding discouragement of "membership in any labor organization," Sec. 8(a)(3) and refusal "to bargain collectively with the representatives of ... employees" , Sec. 8(a)(5)